[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 28 2000
THOMAS  K. KAHN
CLERK

No. 99-12086

D. C. Docket No. 98-00794-CR-DLG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GLORIA SANTA,
a.k.a. Gloria Santa-Betancur,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Florida

(December 28, 2000)

Before TJOFLAT, HILL, and POLITZ* Circuit Judges.

_____
        * Honorable Henry A. Politz, U.S. Circuit Judge for the Fifth Circuit, sitting by
designation.

TJOFLAT, Circuit Judge:

## I.

## A.

In August, 1998, a Confidential Informant ("CI") working with the Drug Enforcement Agency ("DEA") began communicating with Juan Ramirez and his wife, Gloria Santa, about purchasing approximately one kilogram of heroin. Ramirez informed the CI that he expected to receive a kilogram of heroin on or about October 4, 1998, and that they could arrange a sale then. In the meantime, the CI kept in touch with Ramirez and Santa by telephone and by visiting them at their place of employment, Tony's Furniture Store ("the Store") in northwest Miami.

During a series of recorded telephone conversations, the CI arranged to meet Ramirez and Santa at the Store on October 5, 1998, to purchase a "sample" amount of heroin. DEA agents set up surveillance at the Store and equipped the CI with a body wire. Once inside the Store, the CI purchased 1.7 grams of heroin from Ramirez for $100, and the two discussed a possible sale of the entire kilogram. Ramirez told the CI that if the CI found the sample to be acceptable, Ramirez could arrange a larger transaction at Ramirez and Santa's residence in Miami Lakes. The

CI stated that he first needed to show the sample to his "people," and that he would be in touch about the larger deal.

The CI placed a phone call to Ramirez later that day and told him that he liked the sample and wanted to make another buy. Ramirez instructed the CI to get in touch with Santa so that she could contact the heroin supplier and make arrangements. As directed, the CI called Santa, explained that he had $5,000 to buy heroin, and asked her to get in touch with the supplier. Santa promised to notify the CI after speaking with the supplier, but the CI did not hear back from her.

The DEA agents continued their surveillance at the Store through Wednesday, October 7. On that day, the CI called Ramirez to find out whether he wanted to proceed with the heroin deal.[1] Ramirez told the CI that the supplier would be at the Store at 12:30p.m., and instructed the CI to call back at 1:00p.m. to find out whether the supplier would agree to make the sale. When the CI called back as instructed, Ramirez told him that the supplier had agreed to go forward

---

[1] While the October 5 conversations between the CI and Ramirez and Santa were recorded and transcribed, prior and subsequent unrecorded conversations were only summarized in written DEA reports. Portions of the summarized conversations are inaccessible, as they were "blacked out" to conceal sensitive information such as the identities of the CI and the undercover DEA agent. The substance of the DEA reports was introduced by oral testimony during the suppression hearing.

with the transaction and that the CI was to be at the Store in one hour with the money.

Although the record is not entirely clear, it appears that the CI showed up to meet Ramirez and the supplier – Gilbert Gallego – at the Store sometime before 4:00p.m. Plans were made during that meeting to complete the drug transaction at Ramirez and Santa's apartment.[2] Someone (presumably Ramirez) began to give directions to the apartment but was interrupted by Gallego, who suggested that the parties meet back at the Store at 4:00p.m. and then proceed from there to Ramirez and Santa's apartment to complete the deal.

At approximately 4:00p.m., Ramirez, Santa, Gallego, the CI, and an undercover DEA agent posing as the CI's "money man" met at the Store. They confirmed that the transaction would occur at Ramirez and Santa's apartment in Miami Lakes. Gallego would leave the Store alone and bring the heroin to the apartment from an undisclosed location. Ramirez, Santa, and Gallego were led to believe that the undercover agent's role was to guard the purchase money somewhere outside the apartment while the CI went inside to inspect the drugs. If

---

[2] Because the CI was not wearing a body wire during this meeting, he left the Store at some point to inform a surveilling undercover agent that the transaction would take place at Ramirez and Santa's apartment.

the drugs looked good, the CI would leave the apartment, get the money from the undercover agent, and return to complete the exchange.

The parties left the Store at approximately 4:25, with Ramirez and Santa in the front car leading the way to the apartment. The CI and the undercover agent followed Ramirez and Santa in another car, and Gallego left in his vehicle to retrieve the heroin. While en route, the CI and the undercover agent advised the surveilling agents that the group would complete the heroin transaction at Ramirez and Santa's apartment. The DEA had established surveillance at the apartment earlier in the day because both Ramirez and Santa had indicated during previous conversations with the CI that the transaction would take place there.[3]

Ramirez, Santa, the CI, and the undercover agent arrived at the apartment at approximately 4:50, and the CI followed Ramirez and Santa inside. The undercover agent apparently "left the area," although the record is unclear about

---

[3] During a recorded phone conversation on October 5, Ramirez told the CI to "come to my house, you bring the money." Later that day, the following exchange took place during a recorded phone call between the CI and Santa:

CI:      I will come to your house and pick it up.
Santa:  Fine.
CI:      When . . .
Santa:   I'll . . . I'll talk to the guy, then I will call you.

This information led DEA agents to believe that subsequent transactions would take place at Ramirez and Santa's apartment. At the suppression hearing discussed infra, Part I.B., DEA Agent Jeffrey LeClair testified that "[the DEA] had an agent set up at the Club Lakes Apartment [on October 7], doing surveillance, figuring they would go back to that location."

where he went.[4]  The DEA agents had instructed the CI that when he saw the heroin, he was to tell Ramirez and Santa that he was going outside to get the money.  As he exited the apartment under that guise, he was to give a prearranged visual signal to the surveilling agents meaning, "I've seen the drugs."

After Ramirez, Santa, and the CI arrived at the apartment, Gallego called Ramirez from the road to let them know that he was stuck in traffic.  While waiting for Gallego to arrive, Santa left the apartment briefly to pick up her children, ages two and four, from somewhere in the apartment complex.  The CI also left the apartment periodically to check in with the undercover agent.  After another call from Gallego, the CI went out to inform the agent that the heroin would soon be at the apartment.

At 6:50, approximately fifteen minutes after hearing from the CI that Gallego was close by, the surveilling agents observed Gallego arrive at the apartment complex.  He emerged from his vehicle carrying a white plastic

---

[4] It may be inferred from the record, however, that the undercover agent was probably within walking distance of the apartment.  On cross-examination during the suppression hearing, DEA Agent Jeff LeClair testified that as soon as the CI exited the apartment, he gave the agents a prearranged visual signal.  When asked whether "the informant, when he came out, . . . went up to the undercover agent's car," Agent LeClair responded, "He never made it that far."  There was apparently no need to continue the ruse once the agents entered the apartment, which occurred less than one minute after the CI gave the signal.  LeClair's statement suggests, however, that had the agents not approached the apartment so quickly, the CI might have reached the undercover agent's vehicle.

shopping bag. Agents then saw Ramirez exit the apartment, but lost sight of him for a short time. When agents spotted Ramirez again, he was carrying a white plastic bag similar to the one Gallego had been carrying. Ramirez brought the bag into his apartment, according to one of the surveilling agents, "as covertly as possible." The CI followed Ramirez into the apartment, and then emerged three to five minutes later giving the prearranged signal to the DEA agents indicating that he had seen the heroin. Gallego had already left the area in his truck, never having entered the apartment.

Within thirty seconds of seeing the CI's signal, two DEA agents – LeClair and Mokwa – and Detective O'Hara of the Hollywood, Florida Police Department approached Ramirez and Santa's first floor apartment. Mokwa went around to guard the sliding glass doors in the back of the apartment, which opened onto a golf course. Meanwhile, LeClair and O'Hara announced themselves at the front door by yelling "police," and found the door locked when they attempted to open it. LeClair kicked in the front door, and he and O'Hara entered with their guns drawn. Mokwa then returned from the rear of the apartment and entered through the front door.

After entering the apartment, LeClair spotted Ramirez approaching the agents from a hallway. The agents ordered Ramirez onto the floor and handcuffed

7

him, and then made a protective sweep of the apartment to find any other persons who were inside. The agents found Santa in the hall bathroom giving her children a bath. Mokwa told her to wrap them up and bring them into the living room, which she promptly did. Santa was neither placed on the floor nor handcuffed.

Approximately two to three minutes after the forced entry, while the other agents were securing the apartment, Mokwa advised Ramirez of his Miranda rights. LeClair told Ramirez that the agents knew there were drugs in the apartment, and asked "if he would just make things easy and tell [the agents] where the drugs were." The agents' weapons were holstered by this time. Ramirez, still on the floor in handcuffs, told the agents that they could search the apartment, and that the heroin was beneath the sink in the master bathroom.[5]

After finding the heroin precisely where Ramirez said it would be, the agents led Ramirez to a table in his living room/dining room area. They removed his handcuffs and asked him to sign a written consent form written in Spanish.[6] Essentially, the agents were asking Ramirez to give his written consent to the search that had just taken place. Ramirez read the consent form silently and signed

---

[5] The protective sweep conducted while Ramirez was being detained on the floor did not uncover the drugs.

[6] There is evidence that Ramirez understood at least some English, as he had been speaking to the agents in English prior to being presented with the consent form. Spanish, however, is Ramirez's native language.

8

it.[7]  According to the DEA agents' testimony at the suppression hearing, a total of five to ten minutes passed between the initial police entry and Ramirez's signing of the consent form.[8]

Santa was placed under formal arrest after the heroin was found in the bathroom, and Gallego was stopped and arrested by agents who had followed his vehicle from the Miami Lakes apartment.  On October 16, 1998, a Southern District of Florida grand jury returned a two-count indictment against Ramirez, Santa, and Gallego pursuant to 21 U.S.C. § 846 for conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), and, pursuant to 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, for possession with intent to distribute heroin.

## B.

Ramirez and Santa filed motions to suppress the heroin seized during the search of the Miami Lakes apartment, alleging that the agents' warrantless entry

---

[7] Also added to the consent form, in Ramirez's handwriting, was Ramirez's express consent to a search of his vehicle.

[8] Agents LeClair and Mokwa testified that only two to three minutes passed between the police entry and Ramirez's statement that the drugs were in the master bathroom.

was unlawful and that the subsequent consent given by Ramirez was invalid.[9]  In response, the Government contended that exigent circumstances – namely, a possibility that Ramirez or Santa would flee or destroy the drugs – supported their warrantless entry and search of the apartment.  The Government contended in the alternative that even if the entry were illegal, Ramirez's subsequent verbal and written consent to search was voluntary and therefore valid.

The magistrate judge held a suppression hearing on January 25, 1999, at which Agent LeClair testified that he felt the warrantless police entry was necessary because "[the heroin] could be flushed down the toilet.  Somebody could escape through the back door. [The apartment] was on a golf course.  It was very hard to surveil.  [Approaching agents could be seen] from the window overlooking the parking lot . . . ."  LeClair further testified that he was afraid a "rip off" would take place, in which Ramirez and Santa would abscond with the drugs before Gallego or the CI returned to the apartment.  Finally, LeClair stated that the agents intended to arrest Ramirez, and were afraid he would attempt to leave the apartment and flee if not apprehended immediately.  Despite the agents' plan to

---

[9] Gallego did not file a motion to suppress, as he had no standing to contest the search of the apartment.

arrest Ramirez and seize the drugs, LeClair conceded that the agents never attempted to obtain an arrest or search warrant.

In his Report and Recommendation ("R & R"), the magistrate judge found that probable cause to arrest Ramirez and Santa existed when the warrantless entry was made, but that "the facts in this case would not lead a reasonable, experienced agent to believe that evidence might be destroyed at the time entry was made and before a warrant (at least a phone warrant) could be obtained." Thus, the magistrate judge found that there were no exigent circumstances to support the agents' warrantless entry. Nonetheless, the magistrate judge recommended that the motions be denied on the ground that

> the consent given by . . . Ramirez was valid. . . . [T]here were no guns
> drawn on . . . Ramirez when he gave his verbal consent, nor were
> there any threats or coercion. Rather, the evidence shows that . . .
> Ramirez decided to cooperate with authorities once he was informed
> that they were aware the heroin was in the house. The fact that
> Ramirez signed a consent to search form buttresses the finding that the
> consent was voluntary.

The district court adopted the magistrate judge's R & R and denied the motions to suppress.[10] Ramirez chose not to appeal the court's ruling and entered a plea of guilty to both counts of the indictment. Santa entered a conditional guilty

---

[10] The initial district court judge who handled the case adopted only part of the magistrate's R & R, but later disqualifed himself upon Santa's motion.

11

plea and then filed the instant appeal challenging the district court's denial of the motion to suppress. We now reverse the district court's denial of Santa's motion and remand the case for further proceedings.

II.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." United States v. Zapata, 180 F.3d 1237, 1240 (11th Cir. 1999). We are required to accept the district court's factual findings as true, unless those findings are shown to be clearly erroneous. Id. "We must further construe those facts in the light most favorable to the party that prevailed in the district court, which in this case is the United States." United States v. Gonzalez, 71 F.3d 819, 824 (11th Cir. 1996). The district court's application of the law to those facts, however, is reviewed de novo. Id.

The agents' testimony at the suppression hearing established that law enforcement officers entered the apartment with two separate goals: (1) to ensure that evidence of the crime was not destroyed or stolen, and (2) to arrest Ramirez. Thus, our initial inquiry is whether agents could, absent a search warrant, lawfully enter the apartment to search for and seize the heroin. If so, the voluntariness of Ramirez's consent to search is immaterial; no consent was needed. If the agents

12

could not lawfully enter to search for the heroin, the question then becomes whether, absent an arrest warrant, police could lawfully enter the apartment to seize Ramirez. If so, then consent to search areas of the apartment beyond Ramirez's wingspan would have been necessary, and the voluntariness of Ramirez's consent is of paramount concern. Finally, even if the agents' entry was unlawful under theories of both search and arrest, the question remains whether Ramirez's consent to the search of his apartment, even if voluntary, was tainted by the illegality and thereby rendered invalid. We consider each of these issues in turn.

## III.

### A.

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980). "A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc). There is no dispute in this case that police had probable cause to search the apartment after the CI signaled that the drugs were inside. The question

to be addressed, then, is whether the circumstances were sufficiently "exigent" to justify the warrantless search.

Although "[c]ourts have catalogued several situations in which exigent circumstances exist, . . . it is clear that the exception must be applied carefully to each factual scenario." United States v. Lynch, 934 F.2d 1226, 1232 (11th Cir. 1991) (citing United States v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983)). "[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show the need for it . . . .'" Chimel v. California, 395 U.S. 752, 762, 89 S. Ct. 2034, 2039, 23 L. Ed. 2d 685 (1969) (alterations and omissions in original) (quoting United States v. Jeffers, 342 U.S. 48, 51, 72 S. Ct. 93, 95, 96 L. Ed. 59 (1951)). The exigency exception only applies when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983). Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." Blasco, 702 F.2d at 1325.

This circuit has recognized that "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed." Tobin, 923 F.2d at 1510 (quoting United States v. Young, 909 F.2d 442, 446 (11th Cir. 1990)). "The mere presence of contraband, however, does not give rise to exigent circumstances." Lynch, 934 F.2d at 1232. "The test of whether exigent circumstances exist is an objective one . '[T]he appropriate inquiry is whether the facts . . . would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" Tobin, 923 F.2d at 1510 (quoting United States v. Rivera, 825 F.2d 152, 156 (7th Cir. 1987)).

In this case, the Government contends that the officers had to secure Ramirez and Santa's apartment immediately to prevent the destruction of evidence and Ramirez's escape. The occupants of the apartment, however, were unaware that they were under police investigation. Agent LeClair testified that the surveilling DEA agents were all in unmarked vehicles and that they had done nothing to disclose their presence to Ramirez, Santa, or Gallego. The agents had no cause to believe that the CI had "tipped off" the suspects. Thus, there was

nothing to indicate that Ramirez, Santa, or Gallego had become aware of their presence.[11]

It is well settled that "[c]ircumstances are not normally considered exigent where the suspects are unaware of police surveillance." Tobin, 923 F.2d at 1511. Ramirez and Santa, unaware of their impending arrest, had no reason to flee or to destroy the valuable drugs they were trying to sell. Indeed, they intended to exchange the heroin for a large sum of money. Moreover, it is unlikely that the suspects would have left their two and four-year-old children behind (whom the agents knew were in the apartment), or that they would have gotten very far if they had chosen to flee with them in tow. "[L]aw enforcement officers confronting this

_____

[11] The following exchange occurred during LeClair's cross-examination by defense counsel during the suppression hearing:
Q: There was no indication that – there was police surveillance there. Correct? In other words, you were all in unmarked undercover units?
A: Yes.
Q: And there was no indication that any of the individuals, Mr. Ramirez and Ms. Santa, were aware of police presence, correct?
A: I don't know at what point you're referring to.
Q: At the very point he comes out, the informant comes out at 7:08, in the evening, when he comes out, he gives the prearranged signal, you had not at all, referring to law enforcement, no one from law enforcement had announced their presence, is that correct, prior to that happening?
A: No, sir. . . .
Q: Did law enforcement officers inform any one that they were there conducting surveillance?
A: No, sir.
Q: Did any law enforcement officers ever press a siren or a button I guess in your vehicles to indicate that the police had arrived?
A: No, sir.

16

type of situation can, without great difficulty, maintain surveillance of the premises and either wait to effectuate a valid public arrest when the suspects emerge or seek [a warrant] from a neutral and detached magistrate." United States v. George, 883 F.2d 1407, 1413-14 (9th Cir. 1989) (citations omitted).

The Government argues, however, that waiting for a warrant would have been too risky. First, it contends that the level of difficulty in surveilling the apartment made the situation "touch and go"; agents could not get close to the apartment without being spotted by the suspects, and the suspects had easy access to an unguarded rear door that opened onto a golf course. Fearing an eventual "foot pursuit" across the course,[12] agents desired to apprehend the suspects before they had a chance to exit the apartment.

We flatly rejected an identical argument in United States v. Lynch, 934 F.2d 1226 (11th Cir. 1991), in which the Government contended that exigent circumstances existed where, among other things,

> police could not maintain effective surveillance in Lynch's residential neighborhood; they were limited to helicopter surveillance which can only detect movement by vehicles. Because it would have been possible for someone inside the house to flee undetected on foot, the Government argues, the police needed to secure the home immediately. We will not hold that the warrantless search of an

---

[12] The record fails to set forth the layout of the golf course abutting defendants' apartment, and is silent as to what kind of foliage, if any, lay between the apartment and the golf course.

17

individual's home may be justified by the police's inability to maintain effective surveillance, particularly when no exigency has been established.  Such a holding would run counter to all established [F]ourth [A]mendment precedent.

934 F.2d at 1233 n.4.  As will be explained below, any exigency perceived by the agents on the evening of October 7 was either unsupported by the evidence or created by law enforcement officials themselves.  As such, it was no exigency at all, but merely an inexcusable failure to comply with the Fourth Amendment's warrant requirement.  Without more, an inability to maintain effective surveillance will not suffice to overcome the warrant requirement.

The Government's next argument in favor of the warrantless entry is that Ramirez and Santa would have become suspicious if the CI did not return promptly with the money, and that their suspicion would have motivated them to destroy the drugs.  Indeed, some courts have held that where the evidence supports an inference that the suspects expect to meet or contact their co-conspirators before police can obtain a warrant, it is reasonable for police to assume that the suspects' suspicions create a substantial risk justifying a warrantless entry and search.  See, e.g., United States v. Clement, 854 F.2d 1116, 1120 (8th Cir. 1988) (per curiam) (failure of courier to return, as expected, with proceeds from specific drug transaction); United States v. Altman, 797 F.2d 514, 515 (7th Cir. 1986) (per

18

curiam) (same); United States v. Moore, 790 F.2d 13, 16 (1st Cir. 1986) ("Because the sale and the arrests took place immediately outside the . . . apartment, the agents could reasonably believe that the failure of [the arrested cohorts] to return to the apartment promptly with the money could create a substantial risk that appellant would flee or destroy evidence."); United States v. Eddy, 660 F.2d 381, 384-85 (8th Cir. 1981) ("the evidence indicates a rather elaborate scheme . . . which would have required [the arrested cohort's] speedy return to the apartment.").

There is no evidence in the record, however, to suggest how soon Ramirez and Santa expected the CI to return with the money. We cannot discern how far from the apartment the undercover agent – who was supposedly holding the money – was located. We are also without information regarding what the CI told Ramirez and Santa about when he would return to the apartment. Mere speculation about Ramirez and Santa's suspicions, without any factual support, is not enough to overcome the warrant requirement. See Lynch, 934 F.2d at 1233; cf. United States v. Salgado, 807 F.2d 603, 609 (7th Cir. 1986) ("A mere possibility that evidence will be destroyed . . . is not enough. Otherwise the requirement of a warrant would have little meaning in the investigation of drug crimes.").

Even if we assume, however, that Ramirez and Santa expected the CI to return to the apartment within a few minutes of his departure, the agents' warrantless entry of the apartment was unlawful. This court has held that "a warrantless search is illegal when police possess probable cause but instead of obtaining a warrant create exigent circumstances." Tobin, 923 F.2d at 1511 (citing United States v. Scheffer, 463 F.2d 567, 575 (5th Cir. 1972), which held that where customs agents planned a cocaine delivery and could have controlled the time at which it took place, the agents had no valid excuse for failing to obtain a search warrant,[13] and United States v. Munoz-Guerra, 788 F.2d 295, 298 (5th Cir. 1986) (holding that where agents can get a warrant instead of revealing themselves and making immediate entry a foregone necessity, a warrantless search must be deemed unreasonable)); see also United States v. Duchi, 906 F.2d 1278, 1285 (8th Cir. 1990) (holding that evidence must be suppressed where the police created the exigency that the suspect would open a tampered package and destroy the evidence therein). It is true that the contraband did not actually arrive at Ramirez and Santa's apartment until 7:00p.m. on October 7. Thus, probable cause to believe that the drugs were in the apartment did not exist until that time. With the

[13] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

information gathered on that day and during the preceding two days, however, agents had probable cause to believe that the drugs <u>would be</u> in the apartment on that evening. Indeed, they knew how and when the drugs would be transported, where they would be received, who would deliver them, and who would receive them. If this information was sufficient to merit the issuance of a search warrant <u>before</u> 7:00p.m. on October 7, the warrantless entry cannot be justified by exigent circumstances.

Anticipatory search warrants, i.e., warrants that become effective upon the happening of a future event, "have repeatedly been upheld where they are supported by probable cause and the conditions precedent to the search are clearly set forth in the warrant or supporting affidavit." <u>United States v. Loy</u>, 191 F.3d 360, 364 (3d Cir. 1999) (citing <u>United States v. Hugoboom</u>, 112 F.3d 1081, 1085 (10th Cir. 1997) (collecting cases)). Indeed, every circuit to have addressed the question has held that anticipatory search warrants are not categorically unconstitutional. <u>See, e.g.</u>, <u>United States v. Ricciardelli</u>, 998 F.2d 8, 11 (1st Cir. 1993); <u>United States v. Garcia</u>, 882 F.2d 699, 702-704 (2d Cir. 1989); <u>Loy</u>, 191 F.3d at 364, <u>United States v. Goodwin</u>, 854 F.2d 33, 36 (4th Cir. 1988); <u>United States v. Wylie</u>, 919 F.2d 969, 974 (5th Cir. 1990); <u>United States v. Rey</u>, 923 F.2d 1217, 1221 (6th Cir. 1991); <u>United States v. Leidner</u>, 99 F.3d 1423, 1425-26 (7th

Cir. 1996); United States v. Bieri, 21 F.3d 811, 814-15 (8th Cir. 1994); United States v. Hale, 784 F.2d 1465, 1468-69 (9th Cir. 1986), abrogation on other grounds recognized by United States v. Weber, 923 F.2d 1338 (9th Cir. 1990); Hugoboom, 112 F.3d at 1085-87. While adopted across the board by our sister circuits, the constitutionality of such warrants is a question of first impression in this circuit.[14]

Anticipatory search warrants have been described as "differ[ing] from traditional warrants in that they are not supported by probable cause to believe the items to be seized are at the place to be searched when the warrant is issued." Loy, 191 F.3d at 364. At first blush, therefore, it would seem as though such warrants fail to meet the Fourth Amendment's probable cause requirement. Indeed, the case law in this circuit demands that "probable cause must exist when the magistrate judge issues the search warrant." United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994). Construed properly, this statement does nothing to undermine the

---

[14] In United States v. Nixon, 918 F.2d 895 (11th Cir. 1990), we addressed the issue in a footnote, stating that "we note that [anticipatory search] warrants are appropriate only where the contraband is on a 'sure course' to a known destination, such as through the mail." Nixon, 918 F.2d at 903 n.6. It is well settled, however, "that no opinion can be considered as binding authority unless the case calls for its expression." Indiviglio v. United States, 249 F.2d 549, 561 (5th Cir. 1957), rev'd on other grounds by Indiviglio v. United States, 357 U.S. 574, 78 S. Ct.1381, 2 L. Ed. 2d 1547 (1958). As the court's statement in Nixon was unnecessary to its decision, it is dictum and does not control our decision in this case.

legality of anticipatory search warrants,[15] for such warrants are, when properly issued, supported by probable cause. "[T]he fact that the contraband is not presently located at the place described in the warrant is immaterial, so long as there is probable cause to believe that it will be there when the search warrant is executed." Garcia, 882 F.2d at 702 (internal quotes omitted). Indeed, even a warrant based on a known presence of contraband at the premises rests on the expectation that the contraband will be there when the warrant is executed. Id. The rationale for upholding the use of anticipatory search warrants is well set forth in United States v. Gendron, 18 F.3d 955, 965 (1st Cir. 1994), where Chief Judge Breyer, now Justice Breyer, spoke for the panel as follows:

> In general, the simple fact that a warrant is "anticipatory" – i.e., that it takes effect, not upon issuance, but at a specified future time – does not invalidate a warrant or make it somehow suspect or legally disfavored. Warrants often do specify that they will take effect upon issuance. But the Constitution imposes no such requirement. Rather, it says that a search must not be "unreasonable," and that warrants must be supported by "probable cause." U.S. Const. amend. IV. There is nothing unreasonable about authorizing a search for tomorrow, not

---

[15] We note that this language most often appears in cases dealing with "stale" search warrants, i.e., warrants that, when issued, were based on information too old to create a sufficient probability that the items sought were still at the location to be searched. In other words, the passage of time made it more likely that the circumstances upon which the warrant was issued had changed, thus dissipating probable cause. See, e.g. United States v. Bervaldi, 226 F.3d 1256, 1264-65 (11th Cir. 2000). The argument against anticipatory warrants is just the opposite: that the facts giving rise to probable cause have not yet occurred. The response, simply put, is that probable cause to believe that the contraband is at the location to be searched exists when the contraband arrives there. If it does not arrive within the parameters set forth in the warrant, the warrant does not "mature," and no search can lawfully be made.

today, when reliable information indicates that, say, the marijuana will reach the house, not now, but then. Nor does it seem automatically unreasonable to tie the warrant's search authority to the future event that brings with it the probable cause (e.g., the time of "delivery of a large brown package addressed to X with return address Y"). Ricciardelli, 998 F.2d at 10-11. In principle, the use of a "triggering event" can help assure that the search takes place only when justified by "probable cause"; and anticipatory warrants may thereby offer greater, not lesser, protection against unreasonable invasion of a citizen's privacy. As one commentator has put it, "as a general proposition the facts put forward to justify issuance of an anticipatory warrant are more likely to establish that probable cause will exist at the time of the search than the typical warrant based solely upon the known prior location of the items to be searched at the place to be searched." 2 Wayne H. LaFave, Search and Seizure § 3.7(c), at 97 (2d ed. 1987). Were "anticipatory warrants" unlawful, law enforcement agents would have to wait until the triggering event occurred; then, if time did not permit a warrant application, they would have to forego a legitimate search, or, more likely, simply conduct the search (justified by "exigent circumstances") without any warrant at all. See Vale v. Louisiana, 399 U.S. 30, 34-35, 90 S.Ct. 1969, 1971-1972, 26 L.Ed.2d 409 (1970); 2 LaFave, supra, § 6.5. We are not surprised that courts have found "anticipatory warrants," considered as a class, perfectly consistent with the Constitution.

Based on this reasoning, we hold that anticipatory search warrants are not per se unconstitutional. In the proper circumstances, such warrants will better serve the objective of the Fourth Amendment by allowing law enforcement agents to obtain a warrant in advance of delivery, rather than forcing them to go to the scene without a warrant and decide for themselves, subject to second-guessing by judicial authorities, whether the facts justify a search. See Garcia, 882 F.2d at 703.

Our inquiry now focuses on whether authorities in the instant case could have obtained an anticipatory warrant to search Ramirez and Santa's apartment on October 7. If so, we cannot credit the Government's argument that lack of time to obtain a search warrant once the drugs were delivered necessitated a warrantless entry, for the agents need not (indeed, they should not) have waited that long.

"As with all warrants, there must be a sufficient nexus between the contraband to be seized and the place to be searched before an anticipatory warrant can be issued." Loy, 191 F.3d at 365. Affidavits supporting the application for an anticipatory warrant "must show, not only that the agent believes a delivery of contraband is going to occur, but also how he has obtained this belief, how reliable his sources are, and what part government agents will play in the delivery." Garcia, 882 F.2d at 703.

There is no doubt that agents possessed sufficient information to obtain an anticipatory search warrant for Ramirez and Santa's apartment several hours before the forced entry occurred. It was no later than the early afternoon of October 7 when the DEA knew the location and approximate time of the planned drug transaction. The parties had agreed that the sale would take place at the apartment that evening after Gallego delivered the drugs, and the CI promptly imparted this knowledge to the surveilling agents. Agent LeClair testified that the CI had

25

provided law enforcement agents reliable information in the past, and agents had independent confirmation of most of the information on audiotape.

We see no reason why agents, with this information, could not have gone before a magistrate to obtain a search warrant. In the age of telephonic warrants,[16] we doubt that it would have been impossible (or even difficult) to obtain a warrant by telephone on that Wednesday afternoon. If we were to condone the warrantless entry of Ramirez and Santa's apartment under the circumstances presented here, we would effectively allow officers to create exigencies by failing to procure a warrant while there was time to do so. Every situation would become an eventual emergency; the practice of obtaining a warrant would soon fall by the wayside, and the exception would swallow the rule.[17] Thus, we hold that in circumstances such as those presented here, where law enforcement agents have ample time and information to secure an anticipatory search warrant, lack of time to obtain a

---

[16] Fed. R. Crim. P. 41 (c)(2)(A) states, "If the circumstances make it reasonable to dispense, in whole or in part, with a written affidavit, a Federal magistrate judge may issue a warrant based upon sworn testimony communicated by telephone or other appropriate means, including facsimile transmission."

[17] As Justice Jackson aptly noted in <u>Johnson v. United States</u>, 333 U.S. 10, 13-14, 68 S. Ct. 367, 369, 92 L. Ed. 436 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

warrant <u>after</u> delivery of the contraband is insufficient to justify a warrantless search.

B.

Just as the warrantless entry was illegal if its purpose was to conduct a search, so it was if its purpose was to effect Ramirez's arrest.[18]  Although Agent LeClair emphasized the agents' fear that the suspects would destroy the heroin if not apprehended immediately, he also stated that the purpose of the warrantless entry was to arrest Ramirez.[19]  During the suppression hearing, LeClair was called as a defense witness after testifying for the Government, and the following exchange took place during the Government's cross-examination:

---

[18] We note, however, that
> [a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction.  The exclusionary principle of <u>Wong Sun</u> and <u>Silverthorne Lumber Co.</u> delimits what proof the Government may offer against the accused at trial, closing the courtroom door to evidence secured by official lawlessness. [Appellant] is not [himself] a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct.

<u>United States v. Crews</u>, 445 U.S. 463, 474, 100 S. Ct. 1244, 1251, 63 L. Ed. 2d 537 (1980) (internal citations omitted).

[19] The magistrate judge acknowledged as much in his R & R, stating that "Agent LeClair testified that the agents went to the apartment to arrest . . . Ramirez, and possibly . . . Santa."

Q: [Y]ou went into the apartment to arrest, specifically to arrest Ramirez?

A: Yes.

Q: There was a possibility you would arrest Santa?

A: Yes.

Q: But foremost on your mind was the arrest of Ramirez?

A: Yes.

Q: And ultimately, all these events happened after you went – within two minutes of your going in to effect the arrest of Ramirez?

A: Yes.

. . . .

Q: Now, along the way, there was a question as to whether agents were pursuing anyone prior to entering the apartment, but from the very beginning there was a target in mind. Is that not correct?

A: Yes.

Q: You did enter the apartment for the purpose of arresting Mr. Ramirez?

A: Yes.

. . . .

Q: You were concerned that he could have left the apartment. Is that correct?

A: Yes.

Q: And, in fact, there was another door that he could have used to exit?

A: As well as I believe a couple of other windows that could have –

Q: So, earlier when you answered the question as to pursuit[,] were you thinking about running kind of pursuit or were you thinking of the broader context of a pursuit of a subject?

A: I believe I was meaning the broader kind of pursuit.

Q: Were you thinking that there was no pursuit in that Mr. Ramirez might not have gotten out of the apartment window or the back door?

A: No. It was very feasible he could've gotten out of the apartment.

Q: So –

A: And foot pursuit, per se.

Q: As far as being on his trail, you were on his trail from the time he left the furniture store?

A: Correct.

Q: But once the drugs came in and you had the signal, the heat, if you will, of the circumstances turned up a great deal. Is that not right?

A: Yes, it did.

Q: So, at that point, once you got the signal, you were very concerned that he might hightail it out of there?

A: Yes.

It is clear from LeClair's testimony that the agents' goal when entering the apartment was to arrest Ramirez. What is equally clear, however, is that agents did not have an arrest warrant empowering them to do so.

"In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 513, 590, 100 S. Ct. 1371, 1382, 63 L. Ed. 2d 634 (1980); see also United States v. Sandridge, 810 F.2d 1034, 1036 (11th Cir. 1987) (per curiam). Conceding that the agents had no arrest warrant, the Government argues in its brief to this court that exigent circumstances nonetheless justified the agents' entry of Ramirez and Santa's apartment in that

> the location of the apartment made it particularly easy for the defendants to escape or evade the agents. The apartment was located on the first floor of an apartment complex, with a golf course right behind it. The apartment had a sliding glass door that opened onto the golf course from which defendants could readily escape. The agents could not adequately watch the sliding glass door because they would be seen by the defendants inside. In addition, the front window of the apartment overlooked the parking lot where agents were conducting surveillance. Although there was no evidence that Ramirez or Santa were actually aware of the law enforcement surveillance prior to the agents' entry into the apartment, it was entirely possible that the defendants would have observed the agents through the front window, especially because the agents were wearing their DEA jackets and had to run thirty or forty yards across the parking lot to get to the apartment. In addition, the location of the residence within an

apartment complex created the risk that the suspects could flee and
endanger the other residents of the complex while evading arrest.

The Government contends that these circumstances would lead a reasonable,
experienced agent to believe that the defendants might escape into the apartment
complex or onto the golf course abutting their apartment before a warrant could be
secured.[20]   We find no merit in this argument.

"The government is not compelled to effect an arrest upon the occurrence of
probable cause to believe a crime has been committed," United States v. Hultgren,
713 F.2d 79, 87 (5th Cir. 1983); they may seek and obtain a warrant with the intent
to exercise it later.  The DEA could have secured an arrest warrant for Ramirez as
early as October 5, 1998, when he sold the CI a "sample" amount of heroin at the

_____

[20] Had Ramirez or Santa left the apartment, the agents would not have needed a warrant
to effect their immediate arrest.  In such a case, the necessary inquiry would not be whether there
was a warrant or whether there was time to get one, but whether there was probable cause for the
arrest.  21 U.S.C. § 878 provides that:

> (a) Any officer or employee of the Drug Enforcement Administration or any State
> or local law enforcement officer designated by the Attorney
> General may –
> . . . .
> (3) make arrests without warrant (A) for any offense against the United
>  States committed in his presence, or (B) for any felony, cognizable
>  under the laws of the United States, if he has probable cause to believe
>  that the person to be arrested has committed or is committing a felony.

21 U.S.C. § 878(a)(3) (1994).  Thus, agents could have lawfully arrested Ramirez or Santa
without a warrant the moment they exited the apartment.  See United States v. Watson, 423 U.S.
411, 423-24, 96 S. Ct. 820, 827-28, 46 L. Ed. 2d 598 (1976) (holding that an officer may make a
warrantless arrest in a public place if the officer has probable cause to believe that the suspect
has committed a felony).

31

Store.  Similarly, probable cause to arrest Santa for conspiracy to possess heroin with intent to distribute arose on October 5, when she talked with the CI on the phone about arranging the later sale.  Thus, agents could have arrived at the apartment on October 7 armed with warrants for both suspects.  "[W]hile the opportunity to seek a warrant is not determinative, it is certainly relevant when exigent circumstances are pleaded."  United States v. Duchi, 906 F.2d 1278, 1283 (8th Cir. 1990) (internal citation omitted).

Moreover, the circumstances relied upon by the Government were not exigent.  Agents could not have been surprised by the location of the apartment or its surroundings; they had been surveilling it for some time.  They could not have been surprised by the delivery of heroin; they were behind the entire scheme.  As discussed above, there was no evidence to suggest that either of the suspects was about to flee or destroy the drugs, or that they were even aware of the agents' surveillance.  The urgency arising after the CI emerged from the apartment was entirely foreseeable – the agents themselves had concocted the ruse.  Ramirez's warrantless in-home arrest may not be justified on the basis of exigent circumstances which were either nonexistent or created by the Government itself. See  Hultgren, 713 F.2d at 86.

C.

While we agree with the district court's conclusion that no exigent circumstances supported the agents' warrantless entry of Ramirez and Santa's apartment, this does not end the inquiry. "It is 'well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent.'" United States v. Freyre-Lazaro, 3 F.3d 1496, 1500-01 (11th Cir. 1993) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44, 36 L. Ed. 2d 854 (1973)). We must determine, therefore, whether Ramirez's consent to search the apartment was valid notwithstanding the illegal entry preceding it.

For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure. United States v. Robinson, 625 F.2d 1211, 1219 (5th Cir. 1980). Thus, the voluntariness of consent is only a threshold requirement; a voluntary consent to search does not remove the taint of an illegal seizure. Id. at 1220. Rather, the second requirement focuses on causation: "[w]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v.

33

United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441 (1963) (internal quotation omitted).

The question whether consent is the product of free will under Wong Sun must be answered on the facts of each case; no single fact is dispositive. Brown v. Illinois, 422 U.S. 590, 603, 95 S. Ct. 2254, 2261, 45 L Ed. 2d 416 (1975). Three factors to be considered in determining whether a voluntary consent was obtained by exploitation of an illegal seizure are: the temporal proximity of the seizure and the consent, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct . Cf. id. at 603-04, 95 S. Ct. at 2261-62 (applying factors to a confession given after an illegal arrest); Dunaway v. New York, 442 U.S. 200, 218, 99 S. Ct. 2248, 2259, 60 L. Ed. 2d 824 (1979) (same); United States v. Valdez, 931 F.2d 1448, 1452 (11th Cir. 1991) (applying factors to consent given following an illegal traffic stop). We assume without deciding that Ramirez's consent to search was voluntary, and dispose of the issue on the ground that such consent did not purge the primary taint of the illegal entry and arrest.

The district court adopted the magistrate judge's R & R, which summarized and decided the issue as follows:

> Defendants argue that the illegal entry vitiates the consent given by
> Ramirez. This Court disagrees. In order for Defendants' position to

34

be correct, this Court would have to find that Ramirez was so affected by the unlawful entry that the consent should be considered involuntary. Had the agents followed the CI back into Defendants' apartment, albeit illegally, rather than having forcibly entered, and had Ramirez consented to the search, the Court would have found the consent to be voluntary. There was no evidence presented which would lead this Court to find that the method in which the agents entered the apartment was so disturbing or had such an effect on Ramirez as to make his consent involuntary. This finding is bolstered by the fact that Ramirez executed a written consent to search form, there was no evidence of hesitation on his part, and indeed Ramirez not only consented to the search but also told the agents where to find the drugs.

The district court's focus on "voluntariness" misstates the law in this circuit. The proper inquiry is not simply whether Ramirez's will was overborne by the agents' illegal entry, but also whether his consent was a "product" of that illegality. The Government has failed to carry its burden of showing that it was not.

> The government may defeat a motion to suppress by demonstrating a break in the causal chain. . . . [I]ntervening events or circumstances independent of the primary illegality may have so attenuated the causal connection as to dissipate the taint of unlawful police action. . . . While a "but for" connection between the unlawful police conduct and the defendant's response will not in itself establish the requisite causal link, neither will an act by a defendant, which may in some sense be considered "voluntary," necessarily break the causal chain.

United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir. 1982) (internal citations omitted). In the instant case, Ramirez's consent to search came approximately three minutes after DEA agents kicked in his door, entered the apartment, ordered him onto the floor, and handcuffed him. Ramirez was read his Miranda warnings

35

as agents conducted a protective sweep of the entire apartment, and was then asked where the drugs were located. After being told to "just make things easy and tell [the agents] where the drugs were," Ramirez stated that they were under the sink in the master bathroom.

Even assuming that Ramirez's consent was voluntary, we hold that the consent was nonetheless a product of the unlawful arrest. "Miranda warnings do not, without more, dissipate the taint of an illegal seizure." Robinson, 625 F.2d at 1220 (citing Dunaway, 442 U.S. at 217-20, 99 S. Ct. at 2258-60). Applying the factors set forth in Brown, 422 U.S. at 603, 95 S. Ct. at 2261, there was neither a significant lapse of time nor any intervening circumstance which could be said to have dissipated the effect of the illegality. The agents' unlawful conduct in entering the apartment and seizing Ramirez, while not "flagrant," had no legal justification.

Finally, the fact that Ramirez signed a consent form after the search was complete does not persuade us that his consent was not the product of the illegal arrest. In Brown v. Illinois, the Supreme Court noted that where Brown had already given one confession during the course of his illegal detention, believed by him to be admissible (although it was not), this belief "bolstered the pressures for him to give the second [confession], or at least vitiated any incentive on his part to

36

avoid self-incrimination." 422 U.S. at 605 n.12, 95 S. Ct. at 2262 n.12. Thus, the second confession was held to be "the result and the fruit of the first." Id. at 605, 95 S. Ct. at 2262. The same reasoning applies here, where Ramirez had already disclosed the location of the drugs and knew that the agents had found them. After agreeing to "just make things easy and tell [the agents] where the drugs were," Ramirez had no reason to refuse to sign a form memorializing what he had already done. Thus, the consent form cannot be viewed as an intervening circumstance sufficient to dissipate the taint of Ramirez's unlawful arrest.

IV.

Although the district court was correct in finding that there were no exigent circumstances to support the warrantless entry of Ramirez and Santa's apartment, the district court nonetheless erred by applying the wrong legal standard to Ramirez's consent to search. Because Ramirez's consent was tainted by his unlawful arrest, it was insufficient to legitimate the search of his residence. Thus, we REVERSE the district court's denial of Santa's motion to suppress and REMAND the case to the district court for further proceedings consistent with this opinion.

SO ORDERED.