UNITED STATES of America

v.

**Robert H. RUSH, Jr.**

**No. CR. 02–93–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

Feb. 20, 2003.

David B. Byrne, Jr., Capell Howard PC, Montgomery, AL, for Robert H Rush. Jr. (1), defendant.

Tommie Brown Hardwick, U.S. Attorney's Office, Montgomery, AL, for U.S. Attorneys.

## ORDER

MYRON H. THOMPSON, District Judge.

On November 27, 2002, United States Magistrate Judge Delores R. Boyd entered a recommendation that defendant Robert H. Rush, Jr.'s motions to suppress physical evidence and verbal and written statements be granted in part and denied in part. This matter is now before the court on the magistrate judge's recommendation and the government's objections to parts of it. For the reasons that follow, the court will sustain the government's objections and will deny Rush's suppression motions in their entirety.

## I. FACTS

On May 29, 2002, at 4:00 p.m., during a statewide marijuana eradication program, Alabama National Guard helicopter pilot Scott Howard spotted several potted plants that he suspected to be marijuana behind a house in Lee County, Alabama. Howard circled the house at an altitude of 500 feet before descending to no lower than 200 feet to verify his suspicion. At that time, he saw an individual in an orange tee-shirt walk onto the front deck of the house, look up at him, and return inside.

Howard then returned to 500 feet and transmitted his location to air and ground units, telling them to hurry because he feared possible destruction of the marijuana plants. Howard was apprehensive because he had witnessed other suspects, upon becoming aware of police surveillance, destroy marijuana plants within minutes. Within 15 minutes of Howard's call, Alabama State Trooper Michael Gross, the pilot of a second helicopter, arrived at the scene and confirmed Howard's suspicion that the plants were marijuana. Either or both Howard and Gross remained in continuous aerial surveillance over the house from 4:00 until 5:30 p.m.

Although Howard did not know it at the time, the individual he saw in the orange tee-shirt was Rush's wife. Frightened by the helicopters' continued presence, Mrs. Rush telephoned her husband at work and asked him to come home immediately; she then sat at the kitchen table, from where she could watch the helicopters circling the house. Rush left work within ten minutes of his wife's call; he detoured more than 20 miles out of his way on his drive home after seeing the helicopters over his residence. Rush eventually reached the gate to his property at 4:55 p.m.

Upon receiving Howard's call for backup, Captain James Majors began heading

to Howard's location, which was about 45 minutes away. Majors also called Deputy Kyle Hobbs and told him to go to the scene to prevent any destruction of evidence. Hobbs arrived at the house at approximately 4:24 p.m., where he waited for Sergeant Glenn Hall. When Hall arrived, Hobbs and Hall approached the house, up an unimproved driveway as long as a football field, with their assault rifles drawn and ready.

As Hobbs stepped on to the house's porch, he saw a Hispanic female—Mrs. Rush, although her identity was unknown to Hobbs at the time—in an orange shirt standing at the window to the left of the door. Both officers approached the door while pointing their weapons at Mrs. Rush, who opened the door and raised her hands. Hobbs then asked her whether there was anyone else in the house, to which she answered, in Spanish, that she did not speak English. The officers handcuffed Mrs. Rush and forced her to the floor, after which Hobbs performed a protective sweep of the house, and Hobbs and Hall made a protective sweep of a barn on the property. It is undisputed that Hobbs and Hall did not have a warrant to search Rush's property.

## II. DISCUSSION

### A. Physical Evidence

■ The magistrate judge has recommended that the physical evidence found on Rush's property be suppressed. The court cannot agree.

■ "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (citation

omitted). "A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." *United States v. Reid*, 69 F.3d 1109, 1113 (11th Cir.1995) (citation omitted). In this case, the officers' aerial observation of growing marijuana clearly satisfies the probable-cause requirement; the magistrate judge, however, found that no exigent circumstances existed to justify the officer's warrantless entry. Specifically, she found that "[t]he mere presence of an individual at the residence, without more, does not furnish adequate support for the conclusion that the marijuana plants were in danger of imminent destruction or removal." Recommendation of the magistrate judge, filed November 27, 2002 (Doc. no. 86), at 18.

■ The Eleventh Circuit Court of Appeals has held that "the test for whether or not exigent circumstances exist is whether the facts would lead a reasonable, experienced agent to believe that evidence might be destroyed or removed before a warrant could be secured." *Reid*, 69 F.3d at 1113. "[T]he need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so easily and quickly destroyed." *Id.* (citation omitted). Thus, the court is not looking at whether the officers possibly could have secured a warrant before they entered Rush's property, *see e.g., United States v. Gardner*, 553 F.2d 946, 948 (5th Cir.1977)[1] ("[T]he reasonableness of a search under exigent circumstances is not foreclosed by the failure to obtain a warrant at the earliest practicable moment."), but whether it was *reasonable* for the officers to believe that evidence might be

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

destroyed before a warrant could be secured.

The facts support a finding that the officers were reasonable in their belief that evidence might be destroyed before a warrant to search Rush's property could be secured. First, and most importantly, the officers were aware of at least one person who knew of the officers' aerial surveillance of the marijuana growing outside, and they did not know how many other people were in or around the house. *See, e.g., United States v. Edwards,* 602 F.2d 458, 467–69 (1st Cir.1979) (holding exigent circumstances justified warrantless entry where agents reasonably believed suspect had become aware of government surveillance, and that there was a high risk of the destruction of evidence); *Gardner,* 553 F.2d at 948 ("The agents could rely on the reasonable forecast that anyone in the house at the time ... seeing the major arrest activity in front of the house ... might be expected to try to dispose of [the drugs]."). Howard and Gross both testified that they had seen evidence being destroyed to escape detection, and Gross testified that he had seen marijuana plants being destroyed in less than 15 minutes, less than five minutes, and less than three minutes. *See United States v. Rubin,* 474 F.2d 262, 268–69 (3d Cir.1973) (listing as a relevant factor in determining exigency "the knowledge 'that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.'") (citations omitted).[2] And, of course, before securing the marijuana plants from destruction, they had to engage in a protective sweep to find out if others were present on the property and, if so, whether they were armed or otherwise dangerous. These circumstances alone support the government's contention that the officers' warrantless entry onto Rush's property was justified by exigent circumstances, lest some evidence be destroyed.

The magistrate judge also highlighted the fact that there were more than 100 potted marijuana plants, implying that nobody could have destroyed all the evidence before police intervention. The question, however, is not whether *all* the evidence would have been destroyed, but whether it was likely that *any* evidence could have been destroyed. The officers' obligation was to prevent the destruction of any of the marijuana plants.

Rush argues, however, that the marijuana plants were under aerial surveillance at all times, eliminating any exigency from the situation. Simply because the plants were under surveillance, however, did not ensure their protection from attempted destruction. First, Howard was a National Guard pilot and was not authorized to make arrests, and therefore could not himself stop anyone from attempting to destroy the plants; Gross, who is authorized to make arrests, had to leave the scene both to refuel and to guide the ground units to the residence. Second, had Gross landed to prevent the destruction of evidence, he would not have had the advantage, if not necessity, of a prior protective sweep and, instead, would have had to make any attempted arrest alone, a dangerous situation when it was unknown

---

**2.** In *United States v. Santa,* 236 F.3d 662 (11th Cir.2000), upon which Rush relies heavily, the Eleventh Circuit found a warrantless entry to be illegal because it was not justified by exigent circumstances. In that case, however, the suspects were "unaware of their impeding arrest, [and] had no reason to flee or to destroy the valuable drugs they were trying to sell.... Law enforcement officers confronting this type of situation can, without great difficulty maintain surveillance of the premises." *Id.* at 670. The case at hand is readily distinguishable because the officers knew that someone inside the house was aware of their presence and therefore would have a reason to destroy the marijuana plants.

know how many people were present in the residence. Further, Howard and Gross were in the air and thus not necessarily in the position to make a timely, not to mention safe, landing on unprotected property with one and perhaps other unknown inhabitants, in order to prevent immediate destruction of *any* of the marijuana plants on the ground.

Finally, had Hobbs and Hall been waiting at Rush's gate for a warrant when someone emerged to attempt to destroy the marijuana plants, they would have had to hurry to try to stop the destruction of evidence, again without there having been a prior protective sweep and thus without knowing how many people were present in the house, the surrounding woods, or in the barn. This potentially would have placed Hobbs and Hall in danger as well. *See, e.g., United States v. Bustamante–Gamez,* 488 F.2d 4, 9 (9th Cir.1973) (finding that, when those inside the residence know of the officers' presence, cordoning off the residence while awaiting a warrant "would enable, perhaps provoke, the suspects to take steps to destroy the evidence, set up resistance to an eventual entry, or plan a desperate flight.").

To be sure, the evidence presented to the magistrate judge reflected that only Rush's wife was on the property at the time the marijuana plants were seen from the air. But the court knows this only through 20/20 hindsight, and whether exigent circumstances existed should be determined not on the basis of 20/20 hindsight, but rather from the perspective of a reasonable officer on the scene taking into consideration the actual circumstances presented to him at the time he had to make a decision whether to proceed without a warrant.

Rush questions whether his wife's mere sighting of one or more helicopters was sufficient for the officers reasonably to fear that she recognized that the helicopters were connected with law enforcement. The evidence, however, need not show with certainty that Rush's wife recognized the helicopter as associated with law enforcement; rather, the test is whether an officer could reasonably believe that she might reach that conclusion. Here, the evidence shows that the officers knew that visible marijuana plants were on the ground, that someone had seen one or more "dark green," low-flying helicopters circling above, and that at least one of those helicopters had the "State of Alabama" emblem on it.[3] The court believes that a police officer could reasonably fear, and conclude, that the person on the ground would similarly fear, and conclude, that such a low flying "dark green" helicopter was more than likely law enforcement. Indeed, while a police officer's judgment should not, as stated, be gauged by the more demanding standard of 20/20 hindsight, the reasonableness of the officers' fear at the time of the Rush search (that the property inhabitant or inhabitants knew that they were being watched by law enforcement) meets even that standard, for two reasons: first, Rush's wife, upon seeing the helicopters, feared that the helicopters were, in her own words, "the government"; second, she immediately called Rush who, in turn, displayed fear that his misdeeds had been uncovered by

---

**3.** The record is unclear as to the exact appearance of the helicopters. Deborah Strawn, one of Rush's neighbors, testified that the helicopters were "dark green." Ellis Mitchell, another of Rush's neighbors, testified that one of the helicopters had a "State of Alabama" emblem on it, and that he could read "State of Alabama" on the helicopter. Howard testified that the helicopter he was flying had a five-digit "bureau number" painted on it. Finally, Mrs. Rush testified that she thought the helicopters might be "the government."

aerial law enforcement by returning to his property by a circuitous route.

Thus, because, from the perspective of a reasonable officer on the scene, it was reasonable to believe that neither Howard nor Gross, nor Hobbs and Hall, could have safely prevented the destruction of evidence had Howard and Gross observed someone approaching the marijuana plants, the entry by officers Hobbs and Hall onto Rush's property was justified by exigent circumstances. The officers' warrantless entry onto Rush's property and the subsequent seizures of the marijuana plants were, therefore, justified under the fourth amendment. As such, the court will sustain the government's objection to the magistrate's recommendation, to the extent that it finds that Rush's motion to suppress physical evidence must be denied.

### B. Written and Verbal Statements

The magistrate judge also recommended that Rush's written and verbal statements be suppressed in part, based on the premise that these statements were tainted as a result of the officers' illegal warrantless entry onto Rush's property. As discussed above, the officers' warrantless entry onto Rush's property and the subsequent arrest of his wife and seizure of the marijuana plants were justified by the exigent-circumstances exception to the warrant requirement. Further, the facts show that Rush made the challenged statements both after he was arrested at his home and after he had been read and had stated that he understood his *Miranda* rights. As such, because there was no illegal search, Rush has no basis upon which to challenge the statements he made to officers inside his home and after he was told his *Miranda* rights. The court therefore will sustain the government's objection to the magistrate's recommendation, to the extent that it finds that Rush's motion to

suppress written and verbal statements is due to be denied.

### III.

Based on the foregoing, it is ORDERED as follows:

(1) The government's objection and supplemental objection, filed December 27, 2002 and January 3, 2003 (Doc. nos. 95 & 97), are sustained.

(2) The recommendation of the United States Magistrate Judge, entered on November 27, 2002 (Doc. no. 86), is rejected in part and adopted in part.

(3) Defendant Robert H. Rush, Jr.'s motions to suppress physical evidence, filed July 31, 2002 (Doc. no. 29), and to suppress verbal and written statements, filed July 31, 2002 (Doc. no. 28), are denied in full.