# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3085

_____

United States of America

*Plaintiff - Appellee*

v.

Ronnie Whisenton

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 16, 2014
Filed: September 2, 2014

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Ronnie Whisenton pled guilty to one count of conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. The district court[1]

_____

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri, adopting the report and recommendations of the Honorable Terry I. Adelman, United States Magistrate Judge for the Eastern District of Missouri.

sentenced him to 60 months imprisonment. Whisenton appeals the district court's denial of his motion to suppress evidence. We affirm.

## I.

We recite the facts as the district court found and stated them in its order denying Whisenton's motion to suppress. See United States v. Ellis, 501 F.3d 958, 961 (8th Cir. 2007). On the morning of March 1, 2012, a task force of federal agents and local police officers (the agents) followed Adrian Renee Bollinger to a residence in St. Louis. The agents had been tracking Bollinger because of her suspected involvement in drug trafficking. Bollinger pulled into the residence's driveway and parked. Shortly after, a man, later identified as Whisenton, exited the house and entered Bollinger's car. The agents saw Whisenton and Bollinger bend down in the vicinity of an area of the car the agents knew contained a hidden compartment.[2] Whisenton remained in the car for a few minutes and then, carrying a grocery bag, returned to his house. Bollinger drove away from the house. Shortly after, local police officers stopped her for a traffic violation. Bollinger refused consent to search her car, but a canine alerted the officers to drugs in the car. The agents searched the vehicle and discovered approximately $73,000 in the hidden compartment.

That afternoon, the agents returned to Whisenton's house. The agents decided to utilize a "knock and talk" tactic[3] to gain consent to search the house. They requested a records check on the occupants of the house, which revealed that one of the occupants had a criminal record for guns and drugs. While setting up surveillance on the house, the agents saw a woman exit and walk toward a car. The agents approached the woman, who was wearing a correctional officer uniform, and asked

---

[2]The hidden compartment was discovered during a traffic-stop search of Bollinger's car conducted a month earlier.

[3]A police technique where agents "knock[] on the door and seek[] to speak to an occupant for the purpose of gathering evidence." Florida v. Jardines, 133 S. Ct. 1409, 1423 (2013) (Alito, J., dissenting).

her if they could search the house. The woman responded that she would have to ask her husband Whisenton, the owner of the house, who was in the shower at the time. Whisenton's wife entered the house, and about 30 seconds later, the agents knocked on the door. The agents later testified that when Whisenton's wife entered the house, they immediately feared for their safety because, as a correctional officer, she would presumably have access to a weapon. Moreover, the background check indicated that one of the occupants had a criminal history that included firearm possession. About 10 seconds after the agents knocked, Whisenton's wife returned and opened the door. At that point, the agents pushed her back from the door and, with guns drawn, entered the house.

Once inside, the agents directed Whisenton to sit on the couch as they conducted a protective sweep. After the sweep, the agents asked Whisenton for consent to search. Whisenton did not respond. Still on the couch, Whisenton asked the agents if he could smoke a cigarette. The agents permitted him to smoke, and, as he finished, the agents again asked him if they could search the house. Once again Whisenton did not respond. The agents informed Whisenton that they would obtain a search warrant if he did not provide consent to search, and Whisenton and the agents discussed whether the agents were going to tear up his house. After that discussion, Whisenton consented to the search, both orally and through a written consent form. The consent form, which Whisenton signed, stated that he "ha[d] been informed by [the agents] of [his] right to refuse consent to a search of [his] property," he "voluntarily and intentionally consent[ed] to allow [the agents] to search [his] property," and his consent was "freely given and not the result of any promises, threats, coercion, or other intimidation." Order at 7-8. While the search was underway, Whisenton entered the kitchen so Agent Dean O'Hara could interview him. O'Hara orally informed Whisenton of his <u>Miranda</u> rights, and Whisenton proceeded to discuss his criminal activities with O'Hara. During the interview, Whisenton's wife left the premises and returned with Whisenton's mother. Whisenton's mother informed him that he should not cooperate with the agents, but Whisenton responded that he knew what he was doing and told her she could leave.

-3-

As a result of the search, the agents seized two firearms, more than $100,000 in cash, and other drug evidence.

Whisenton was indicted on one count of conspiracy to distribute marijuana. Whisenton filed a motion to suppress all evidence recovered during the search of his home and all statements made to agents on March 1, 2012, the date of the search. The Magistrate Judge agreed with Whisenton that exigent circumstances did not justify the agents' warrantless entry into Whisenton's home. Nevertheless, the Magistrate Judge recommended that the district court deny Whisenton's motion. He reasoned that the evidence was admissible because there was a sufficient break between the agents' warrantless entry and Whisenton's grant of consent to search and his statements to the agents. The district court agreed and denied Whisenton's motion to suppress.

II.

Whisenton appeals the district court's denial of his suppression motion, arguing that the Government failed to show that his "consent was an independent act of [his] free will that purged the taint of the Fourth Amendment violation." See United States v. Greer, 607 F.3d 559, 564 (8th Cir. 2010). The Government contends that exigent circumstances justified the agents' entry, and even if the entry was illegal, that Whisenton's consent to search was sufficient to "purge the primary taint of the [illegal] entry." Id.

We agree with the Government that Whisenton's consent to search was an act of free will sufficient to purge the taint of the claimed Fourth Amendment violation. For purposes of our analysis, we assume that exigent circumstances did not justify the agents' warrantless entry into Whisenton's home, and thus, the agents violated the Fourth Amendment. See United States v. Barnum, 564 F.3d 964, 969 (8th Cir. 2009) (assuming an officer's traffic stop without probable cause violated the Fourth Amendment for purposes of considering whether the defendant's voluntary consent purged the taint of the alleged violation). We review the district court's factual

-4-

determinations for clear error and its legal conclusions de novo. See id. at 968. When an illegal entry precedes a defendant's grant of consent to search, the Government must show (1) that the defendant's consent was voluntary and (2) that "the consent was an independent act of [the defendant's] free will that purged the taint of the Fourth Amendment violation." See Greer, 607 F.3d at 564; United States v. Lakoskey, 462 F.3d 965, 975 (8th Cir. 2006). To determine whether the defendant's consent purged the taint of the illegal entry, we consider "(1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the [agents'] Fourth Amendment violation." See Barnum, 564 F.3d at 971. We also consider "the giving of Miranda warnings where applicable." Greer, 607 F.3d at 564. Whisenton focuses his appeal on whether his consent to search purged the taint of the illegal entry.

The temporal proximity between the illegal entry and the consent to search is relevant to whether "the defendant's consent was influenced by, or the product of, the police misconduct." See Barnum, 564 F.3d at 972. We measure temporal proximity from the point at "which the [agents' conduct] became illegal to the time of the consent." United States v. Esquivel, 507 F.3d 1154, 1160 (8th Cir. 2007). The closer in time the illegal entry and the defendant's consent occurred, the more likely the illegal entry influenced the consent. See Barnum, 564 F.3d at 972. Here, fifteen minutes elapsed between the agents' illegal entry into the house and Whisenton's consent to search. Under our precedent, fifteen minutes is sufficient to demonstrate an attenuation of the illegality. See, e.g., id. (twelve to fifteen minutes); Esquivel, 507 F.3d at 1160 (nine and one-half minutes). That the agents requested consent twice before Whisenton eventually granted it does not alter this conclusion. Because an agent does not violate the Fourth Amendment by merely requesting consent to search, see United States v. Martinez, 168 F.3d 1043, 1047 (8th Cir. 1999), the agents' multiple attempts to obtain consent, absent threats or coercion, do not constitute "police misconduct." Moreover, as examined more fully below, each request provided Whisenton a fresh opportunity to consider whether he should grant

consent. In sum, the temporal proximity between the illegal entry and Whisenton's consent weighs in favor of the Government.

The presence of intervening circumstances that provide the defendant an opportunity "to pause and reflect, to decline consent, or to revoke consent" help demonstrate that the illegality was attenuated. See Greer, 607 F.3d at 564. Here, two notable intervening circumstances occurred prior to Whisenton's grant of consent. First, the agents permitted Whisenton to smoke a cigarette and ask questions about how the agents would search his house. Whisenton specifically asked whether the agents would "tear up his house" if he granted them consent to search. Whisenton's questioning of the agents as to the manner of their search demonstrates his deliberate consideration of the situation, indicating the type of reflection the Greer court found to be critical. See id. Second, the consent form Whisenton signed advised him that he was not required to grant consent. See id. (noting that "the consent form advised [the defendant] that he had a 'right to deny the officer(s) permission to search [his] property'" (second alteration in original)); United States v. Moreno, 280 F.3d 898, 901 (8th Cir. 2002) (noting that the officer "advised [the defendant] that he had the right to refuse to consent to the search"). Moreover, after Whisenton granted consent, the agents orally advised him of his Miranda rights and provided him an opportunity to speak with his mother. These events are meaningful, despite occurring after the initial grant, because Whisenton never attempted to revoke consent after these events occurred. See Greer, 607 F.3d at 564 (noting that the defendant could have revoked consent). Whisenton continued to interact congenially with the agents despite his mother's disapproval of his decision to allow the agents to search. In fact, the district court noted that Whisenton "informed his mother that he knew what he was doing, and told her that she could leave." Order at 15. The second factor weighs heavily in favor of the Government.

The final factor addresses the purpose and flagrancy of the agents' Fourth Amendment violation. See United States v. Herrera-Gonzalez, 474 F.3d 1105, 1111 (8th Cir. 2007); see also Greer, 607 F.3d at 564 ("The Supreme Court has placed

'particular' emphasis on the purpose and flagrancy of the official misconduct." (citing Brown v. Illinois, 422 U.S. 590, 604 (1975))). To analyze whether conduct was purposeful and flagrant, we have often asked whether the violation "'was investigatory in design and purpose and executed in the hope that something might turn up.'" See Barnum, 564 F.3d at 973 (quoting Herrera-Gonzalez, 474 F.3d at 1113)). We have also considered the manner of entry, the amount of force used, and the presence of threats or intimidation. See Greer, 607 F.3d at 564 (noting that the "the door to the residence was open, and the officers used no force to gain access"). Though it declined to fully elaborate, the district court found that the agents entered Whisenton's house for multiple reasons, only one of which involved obtaining consent to search. See Order at 15. A fair reading of the district court's order indicates that the agents' safety concerns also motivated their decision to enter. See United States v. Barker, 437 F.3d 787, 789 (8th Cir. 2006) ("This court will uphold the district court's decision on the motion to suppress if, on review of the record, 'any reasonable view of the evidence supports' the district court's decision." (quoting United States v. Bloomfield, 40 F.3d 910, 913 (8th Cir. 1994) (en banc))). Several agents testified that they entered the house because they feared the situation had become dangerous. See, e.g., Evidentiary Hr'g Tr. at 15-16, 91-94, 163-65. Though we have assumed exigent circumstances did not independently justify the agents' entry, their safety concerns are nonetheless relevant in considering their mixed purposes for entering Whisenton's house.

In addressing the final factor, the district court focused its findings on the agents' manner of entry and their conduct once inside. The court found "[t]here was no forced entry or violent entry, no threats or promises were made to [Whisenton], at no time was [Whisenton] handcuffed, and the credible evidence reveals the interaction was cooperative and calm." Order at 15. The lack of force used to enter and the agents' cordial and professional conduct after entering suggest that Whisenton's consent was an independent act of free will. See United States v.

<u>Conrad</u>, 673 F.3d 728, 736 (7th Cir. 2012); <u>see also</u> <u>Herrera-Gonzalez</u>, 474 F.3d at 1114 ("[E]ven if there was [misconduct], it was certainly not flagrant."). To conclude, the final factor presents a mixed picture, slightly weighing in favor of the Government. Though the agents entered Whisenton's house with mixed motives, including a partially-investigatory motive, the agents' entry was not flagrant and the agents conducted themselves professionally once inside.[4]

Our final balancing of the three factors weighs in favor of the Government. We hold that Whisenton's grant of consent to search was the product of free will sufficient to purge the taint of any Fourth Amendment violation occurring by virtue of the agents' entry. For the same reason, we hold that the district court did not err in admitting Whisenton's statements to Agent O'Hara.

III.

The judgment of the district court is affirmed.

---

[4]The dissent places too much weight on discrepancies between a post-search internal report, in which, according to the dissent, the agents "strongly implied they received consent to enter Whisenton's home," and the "version of events now offered by the Government." *Post*, at 11. The report is silent as to how the agents entered Whisenton's house. Def.'s Mot. Suppress Evidence Statements, Attach. A, at 3, ECF No. 22. Even Whisenton acknowledged that the report never explicitly declared the agents received consent to search prior to entering the house. Def.'s Mot. Suppress Evidence Statements at 2 n.3, ECF No. 22. Though the report could have contained more details, the agent's poor drafting is not particularly relevant to "the purpose and flagrancy of the [agents'] Fourth Amendment violation," <u>see</u> <u>Barnum</u>, 564 F.3d at 971, and we will not assume "improper motive or malicious intent," <u>see</u> <u>id.</u> at 973 n.9.

-8-

BYE, Circuit Judge, dissenting.

I believe the district court erred in denying Whisenton's motion to suppress. I conclude Whisenton's consent was insufficient to purge the taint of the agents' illegal entry of his home. Therefore, I respectfully dissent.

It is a basic principle of the Fourth Amendment that warrantless searches and seizures inside a home are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 585 (1980). "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Id. Here, armed agents entered Whisenton's home without a warrant and without consent. The agents prolonged their unlawful intrusion until they had convinced Whisenton to consent to a search. With that in mind, I will evaluate whether the taint of the agents' constitutional violation was purged by following the same balancing test applied by the majority.

In considering the temporal proximity factor, the majority concludes fifteen minutes elapsed between the agents' illegal entry into Whisenton's home and Whisenton's consent to search. It is true the illegal entry occurred approximately fifteen minutes before Whisenton consented to the search. During those intervening fifteen minutes, however, the agents illegally remained inside Whisenton's home. Thus, I believe it was a continuing violation with no intervening time between the illegality and consent. As I have previously argued: "If we are assessing the taint of the Fourth Amendment violation, logic dictates that we should consider the time period between when the Fourth Amendment violation ends and when the consent to search is given. By concluding otherwise, courts reward officers for prolonging unconstitutional conduct." United States v. Barnum, 564 F.3d 964, 977 (8th Cir. 2009) (Bye, J., dissenting). I find this logic all the more compelling considering the illegal search occurred within Whisenton's home, which distinguishes this matter from the cases involving traffic stops relied upon by the majority. See Chambers v.

-9-

Maroney, 399 U.S. 42, 48 (1970) ("In terms of the circumstances justifying a warrantless search, the Court has long distinguished between an automobile and a home or office."). Had the agents left Whisenton's home and retreated to an area they were constitutionally permitted to be, the constitutional violation would have ended and the clock would have begun to run. Because the agents remained in the home, however, the violation continued and its temporal proximity to the consent given by Whisenton was immediate. Therefore, I believe this factor weighs in favor of Whisenton.

In considering the presence of any intervening circumstances, the majority places great emphasis on the fact that Whisenton was permitted to smoke a cigarette after the agents illegally entered his home. However, the fact that Whisenton felt compelled to ask the armed agents for permission to smoke a cigarette in his own home suggests the agents' actions had overborne his will. In essence, asking for permission to smoke in one's own home is evidence the prolonged unlawful intrusion had a coercive effect on Whisenton. In my opinion, the more compelling fact is that armed agents remained in Whisenton's home as he sat partially-clothed in their presence. Had the agents withdrawn from the home as Whisenton contemplated his options, it would be more reasonable to conclude his consent was freely and voluntarily given. See United States v. Smith, 688 F.3d 730, 740-41 (11th Cir. 2012) (holding that the taint of the officers' illegal entry into the defendant's home was purged by the officers immediately retreating to the outside of the home where they waited until the defendant dressed and joined them). In addition, while Miranda warnings were given, the warnings did not occur until after the warrantless search had commenced, which significantly diminishes their impact. Thus, I conclude the intervening circumstances factor is, at best, a wash.

Finally, I believe the agents' conduct was particularly purposeful and flagrant. Simply because the agents spoke in a cordial tone and did not handcuff Whisenton does not mean their conduct was not flagrant. Most egregious, in my mind, are the

serious inconsistencies between the agents' written report following their illegal entry and the version of events now offered by the Government. The agents' initial report strongly implied they received consent to enter Whisenton's home. In fact, the report contained absolutely no mention of exigent circumstances justifying the agents' entry, even though the agents testified including the circumstances of entry – whether via consent, warrant, or exigent circumstances – would be very important. Motion to Suppress Hearing Tr. at 37. Only after being confronted with Whisenton's surveillance video, months after the events in question, did the Government change its position and claim exigent circumstances, not consent, justified the agents' warrantless entry. The majority adopts the district court's finding of "no forced entry or violent entry" even though the majority also concedes the agents entered the house by pushing Whisenton's wife back from the door with guns drawn. I would certainly classify this type of entry as forceful. In addition, the agents stormed into Whisenton's home less than forty seconds after Whisenton's wife had entered the home to retrieve Whisenton, even though the agents asked her to do exactly that. Under the Government's logic, it seems any time law enforcement conducts a knock-and-talk, they would have a sufficient basis to reasonably believe there was an imminent danger if they were not immediately granted consent to search the premises. I decline to condone such an outcome.

Also, I wish to emphasize the agents had at least five hours to seek a warrant to search Whisenton's home following the arrest of Bollinger, but they failed to do so and provided no explanation for that failure. The agents arrested Bollinger at approximately 9 a.m. However, the agents did not return to Whisenton's home until approximately 3 p.m. During this time, the agents did not maintain surveillance outside of the home nor obtain a search warrant, even though there was seemingly ample reason and opportunity to do so. Because consent searches and exigent circumstances are ripe for abuse, as perhaps demonstrated by this case, I would more strictly scrutinize such searches when the attainment of a search warrant was a reasonable alternative.

Therefore, because my balancing of the three factors weighs in favor of Whisenton, I respectfully dissent.

_____