[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15929

_____

D.C. Docket No. 2:10-cr-14067-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL ANTHONY SMITH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 23, 2012)

Before TJOFLAT, PRYOR and RIPPLE,[*] Circuit Judges.

RIPPLE, Circuit Judge:

---

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

Daniel Anthony Smith entered a conditional guilty plea to receiving and attempting to distribute child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).[1]  Exercising his preserved right to appeal,[2] Mr. Smith seeks review of the district court's denial of his motion to suppress inculpatory physical and testimonial evidence.  He contends, as he did in the district court, that the officers' warrantless and uninvited entry into his house violated the Fourth Amendment and that the evidence that the officers gathered after that entry should be suppressed under the fruit of the poisonous tree doctrine.  For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A.

In October 2009, the police department of Sebastian, Florida received an anonymous tip that an individual identified as "Dan Smith," who worked at a particular pharmacy, had child pornography on a laptop computer.[3]  Local law

---

[1]  The district court's jurisdiction is predicated on 18 U.S.C. § 3231.

[2]  This court's jurisdiction is predicated on 28 U.S.C. § 1291.

[3]  R.1 at 4.

enforcement officers identified Mr. Smith as the apparent subject of the tip and forwarded the information to United States Immigration and Customs Enforcement.  In the following months, Special Agent Brian Ray conducted a "covert cyber investigation" of Mr. Smith, but that investigation did not reveal any incriminating information.[4]

On August 3, 2010, Special Agent Ray, along with Sebastian Police Sergeant William Grimmich and Sebastian Police Detective Daniel Acosta, went to Mr. Smith's duplex to conduct a consensual interview--"a knock and talk."[5] They arrived shortly after 9:00 in the morning in what a witness later described as "the middle of summer, a hundred degrees,"[6] and noticed that the windows were open with the blinds closed.  Special Agent Ray knocked on the door; when Mr. Smith did not answer, the agent began pounding on the door.  He was able to look through the blinds of a front window and see "mounds of beer cans" and a laptop computer in the living room.[7]  Sergeant Grimmich and Detective Acosta walked around the house and yelled into the windows. Both smelled a foul odor

---

[4] Id.

[5] R.33 at 60.

[6] Id. at 103; see also id. at 109 (testimony of an officer indicating that it was "90 degrees, a hundred degrees out").

[7] Id. at 20.

coming from Mr. Smith's apartment.  Detective Acosta thought that the odor was similar to that of a decomposing body, but he did not share his suspicions with the other officers.

The knocking on Mr. Smith's front door was sufficiently loud to wake Mr. Smith's neighbor, Darlene Fowler, who had been sleeping in her bedroom at the rear of the adjoining unit; indeed, she thought initially that the officers were knocking on her door.  After about a minute of knocking on Mr. Smith's door, Special Agent Ray did knock on Fowler's door.  When she answered, he asked her if Mr. Smith was home.  Fowler told Special Agent Ray that she had seen Mr. Smith at home the previous evening and that "he[ had] to be home" because his car was in the driveway and his windows were open.[8]  Fowler expressed some concern that Mr. Smith was not answering the door, and she requested that the officers check on him.[9]  She also appears to have mentioned to Sergeant Grimmich, although not to the other officers, "that Mr. Smith was feeling some

---

[8] Id. at 99, 102.

[9] Fowler's concern appears to have arisen, in part, because of the suicide of a previous tenant of Mr. Smith's apartment.  There is no suggestion in the record that the previous tenant had any connection to Mr. Smith other than having lived in the same unit.  In the suppression hearing, Special Agent Ray acknowledged that the previous tenant's suicide had "no relevance to Mr. Smith's situation." Id. at 72.

4

sort of depression and wasn't acting right."[10]

The officers conferred in front of Mr. Smith's duplex, and Sergeant Grimmich determined that they should conduct a "welfare check"; that is, they should enter the house to ensure Mr. Smith's well-being. Approximately five or six minutes after they first knocked on Mr. Smith's front door, the officers went to the back of the house and entered an unlocked screened-in porch from which they could access a partially open sliding glass door into the house.[11] As Detective Acosta opened the sliding glass door further, Special Agent Ray "heard a moaning-type sound"[12] and Sergeant Grimmich heard "a moan or a gro[a]n coming from inside the residence."[13] Detective Acosta, who was closest to the house, did not hear the sound. After announcing their presence, the officers entered the

---

[10] Id. at 108. This assertion is supported only by Sergeant Grimmich's testimony; Special Agent Ray and Fowler were silent on this point. Additionally, Sergeant Grimmich omitted this important piece of information from his report, which he completed on September 6, 2010, more than a month after the August 3, 2010 incident and the day before the suppression hearing. However, he testified in the suppression hearing that he did not intend his report to be "a transcript of every single detail that happened" on August 3, 2010. See id. at 127. Despite the lack of corroboration, the district court found that Fowler "told one officer that she thought [Mr. Smith] was depressed." R.38 at 5. This finding, supported as it was by Sergeant Grimmich's testimony, was not clearly erroneous. As the Eighth Circuit recently said: "The mere fact an incident report omits certain details is not sufficient to render the officer's testimony concerning the underlying action facially implausible." United States v. Mendoza, 677 F.3d 822, 828 (8th Cir. 2012).

[11] R.33 at 73-74.

[12] Id. at 24.

[13] Id. at 110.

5

home.[14]  Their firearms were drawn and held in a "low raid" position, which Special Agent Ray later described as "[w]eapon out, pointed down toward the floor."[15]  The officers did not take their first aid kits into the house with them, and they had not requested an ambulance or other medical assistance.

The officers walked through the kitchen, turned down a hallway and stopped at Mr. Smith's bedroom door.  Mr. Smith was laying naked on an inflatable mattress.  After Detective Acosta saw that Mr. Smith "was nude and didn't have a weapon, [Detective Acosta] immediately holstered [his] weapon,"[16] and the other officers followed suit.[17]  While standing outside of the bedroom door, Detective Acosta asked Mr. Smith if he was okay.  Mr. Smith said that he was and asked the officers what was going on.  Special Agent Ray stepped into the room, told Mr. Smith that they were there to speak with him and asked Mr. Smith if he was willing to talk.  Mr. Smith indicated that he wanted to get dressed and that he would talk to the officers outside.  The three officers then exited the house

---

[14] There are conflicting accounts in the record as to when the officers first identified themselves as law enforcement agents, but all agree that it was at no later than this point.

[15] Id. at 26.

[16] Id. at 133.

[17] Id. at 90, 112.

6

through the front door, with Mr. Smith eventually following them out.[18]

Once outside, Special Agent Ray falsely told Mr. Smith that, by virtue of "an aggressive monitoring program," the Government had detected that "child pornography had been transmitted from his residence," and that the officers "were interested in taking a look at his computers."[19]  Mr. Smith, who described himself as "particularly computer knowledgeable," told Special Agent Ray that he had a secured wireless network and that he had no reason to believe that it had been compromised.[20]  Mr. Smith denied seeing child pornography on his computer and asked Special Agent Ray when "child pornography had been detected coming from his residence."[21]  When Special Agent Ray told him, again falsely, that the detection had occurred in November 2009, Mr. Smith gestured to the laptop computer that Special Agent Ray had seen through the front window and said that he had not owned that laptop at the time.  He told Special Agent Ray that he had been using a computer that was now broken and "offered [the broken] one for

---

[18]  There is no description in the record as to the length of time between the officers' initial interaction with Mr. Smith and the start of their conversation outside the house.

[19]  Id. at 32-33.

[20]  Id. at 33.

[21]  Id.

examination."[22]  At the point when Mr. Smith offered to show the officers the broken computer, he had been speaking to the officers for approximately four or five minutes.[23]  He then went into the house to retrieve the broken computer, continuing to talk to Special Agent Ray as he did so.  The officers followed Mr. Smith into the house.  During this time, the officers later testified, Mr. Smith was coherent, responsive and cooperative; although he looked "tired," with eyes that "were a little red, bloodshot," he apparently gave the officers no reason to think that he was intoxicated.[24]

Once in the house, Mr. Smith retrieved the broken laptop and brought it to the living room.  Special Agent Smith "pointed out the laptop that was running in the living room and asked [Mr. Smith] if he minded if [the officers] took a look at that"; Mr. Smith responded that "it was okay."[25]  Special Agent Ray then turned the computer around so he could see the screen and saw that the computer was running Ares, a peer-to-peer file-sharing program.[26]  He saw that the laptop was downloading three files with names indicative of child pornography and uploading

---

[22] Id. at 34.

[23] Id.

[24] Id.

[25] Id. at 40.

[26] The record sometimes refers to the name of the program as "Aries."  See id. at 42.

8

about eight similarly named files.  To halt the transmission, Special Agent Ray unplugged the wireless router in Mr. Smith's bedroom.  Special Agent Ray continued to examine the laptop in the living room for a period of time--the record is unclear on how long--and then, because that room was apparently uncomfortable, asked Mr. Smith if they could relocate.  Mr. Smith led Special Agent Ray to a bedroom, where they continued the interview.

Special Agent Ray later testified that, after unplugging the wireless router, he "made sure Mr. Smith knew that he wasn't under arrest, that he was free to talk to [the officers] or not talk to [them]."[27]  At some point--again, the record is unclear as to when--Mr. Smith asked if they could speak outside, both so he could smoke a cigarette and because he was embarrassed about the condition of his house.  After moving outside, Mr. Smith consented verbally to a search of his home, and he signed a consent form to that effect.  The officers identified a number of items that they wanted to take back to the police department to examine, and "Mr. Smith consented to [those requests]."[28]

The officers then asked Mr. Smith to come to the police station to be interviewed.  After expressing some concern about how long it would take--

---

[27] Id. at 46.

[28] Id. at 49.

Mr. Smith apparently had to be at work by 2:00 p.m.--he agreed and opted to be taken to the station in a police vehicle rather than to drive himself.  At the police station, Special Agent Ray read Mr. Smith his Miranda warnings,[29] and Mr. Smith stated that he understood and that he was willing to speak with the officers.  In its filings in the district court, the Government asserted that Mr. Smith confessed to downloading child pornography and to making it available for upload (so that others could download it from his computer via the peer-to-peer file-sharing program).  After obtaining a warrant to search Mr. Smith's computers, Special Agent Ray found at least one video depicting child pornography.

**B.**

A federal grand jury returned a two-count indictment charging Mr. Smith with receiving child pornography and with attempting to distribute child pornography, both of which violate 18 U.S.C. § 2252(a)(2) and (b)(1).  Mr. Smith filed a motion to suppress the evidence seized from his computers, alleging that the officers' initial warrantless entry into his house had violated the Fourth

---

[29] Special Agent Ray later testified that he read Mr. Smith his Miranda warnings not because Mr. Smith was in custody, but because they "were in a more formal setting at that point; and [he] just felt that given all the circumstances, [he] wanted to make sure [Mr. Smith] was aware of his rights." Id. at 53.

Amendment and that his confession and the evidence seized from his computers therefore were subject to suppression as fruit of the poisonous tree. After conducting a suppression hearing at which all three officers and Fowler testified, a magistrate judge concluded that the officers' entry was justified because the officers reasonably had believed that Mr. Smith was in danger. The magistrate judge also concluded that Mr. Smith voluntarily had consented to the interview conducted at his home and to the later searches of the house and the computers located there. Accordingly, the magistrate judge recommended that Mr. Smith's motion to suppress be denied.

Mr. Smith objected to several of the magistrate judge's factual findings, but, after independently considering the record, the district court adopted the magistrate judge's report. It also determined that the circumstances justified a warrantless entry into the house to check on Mr. Smith's welfare and that Mr. Smith's consent had been voluntary. The district court accordingly denied Mr. Smith's motion to suppress.

Mr. Smith then entered a conditional guilty plea, reserving only the right to appeal the denial of his motion to suppress. The district court accepted his plea and sentenced him to 180 months' imprisonment for each count, to be served concurrently, followed by a lifetime of supervised release.

11

Mr. Smith timely appealed the denial of the motion to suppress.

## II

## DISCUSSION

In reviewing the denial of a motion to suppress, "we review the district court's factual findings for clear error[] and its application of the law to the facts de novo."  United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000).  All "facts are construed in the light most favorable to the prevailing party below," in this case, the Government.  Id.

Mr. Smith contends, as he did before the district court, that the officers unlawfully entered his house and that the taint of that entry requires the exclusion of the physical and testimonial evidence used to convict him.  In the Government's view, the entry was justified under the "emergency aid exception" to the warrant requirement and, even if the entry was illegal, the evidence is nevertheless admissible because Mr. Smith's consent dissipated any taint.

Upon examination of the record, we believe that it is unnecessary to address whether the officers' entry into the home violated the Fourth Amendment.  Even if the officers' entry was illegal, the officers did not exploit the circumstances of their entry to obtain the evidence later used to convict Mr. Smith.  Mr. Smith's

consent was both voluntary and sufficiently attenuated from the entry such that any potential taint would have fully dissipated.

Assuming, for the sake of argument, that the initial entry was illegal, we must assess the defendant's subsequent consent through a two-step inquiry: "First, [we] must determine whether the consent was voluntary.  Second, [we] must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the fruit of the poisonous tree-- the product of an illegal entry."  United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007) (internal quotation marks omitted).  "This two step approach is mandatory, and the government bears the burden on both issues."  Id.

In light of Mr. Smith's express concession that his consent was voluntary,[30] our task is limited to the second prong of the inquiry.  This "second requirement focuses on causation."  United States v. Santa, 236 F.3d 662, 676 (11th Cir. 2000). The Supreme Court has explained that the overriding issue in fruit of the poisonous tree cases "is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407,

---

[30]  See Reply Br. 5.

13

417 (1963) (internal quotation marks omitted).

The Supreme Court therefore has recognized, indeed emphasized, that the fruit of the poisonous tree doctrine is subject to significant limitations.  As the Court noted in Hudson v. Michigan, 547 U.S. 586, 126 S. Ct. 2159 (2006):  "Even in the early days of the exclusionary rule, we declined to hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police."  Id. at 592, S. Ct. at 1264 (emphasis in original) (internal quotation marks omitted).  In short, the Supreme Court has not applied mechanically the exclusionary rule to every item of evidence that can be said to have a logical causal connection with police misconduct.  "But for cause," or causation in the logical sense alone, can be too attenuated to justify exclusion.  See United States v. Ceccolini, 435 U.S. 268, 274–75, 98 S. Ct. 1054, 1059-60 (1978). The "dissipation of the taint" concept that the Court has applied in deciding whether exclusion is appropriate in a particular case "attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." Brown v. Illinois, 422 U.S. 590, 609, 95 S. Ct. 2254, 2264 (1975) (Powell, J., concurring in part) (internal quotation marks omitted).  Therefore, attenuation

14

occurs when the causal connection is remote[31] and "when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." Hudson, 547 U.S. at 593, 126 S. Ct. at 2164. "The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." Ceccolini, 435 U.S. at 279, 98 S. Ct. at 1061-62.

In undertaking this analysis, "[w]e are obliged to determine whether the consent was 'sufficiently an act of free will to purge the primary taint of the unlawful invasion,' or, alternatively, whether the causal connection had 'become so attenuated as to dissipate the taint.'" Delancy, 502 F.3d at 1309 (quoting Wong Sun, 371 U.S. at 486-87, 83 S. Ct. at 416-17). This inquiry requires that we review carefully the facts and circumstances of each case. Although no single factor is dispositive, we have identified previously three helpful factors in framing the analysis: (1) the temporal proximity of the illegal act and the subsequent consent, (2) the intervening circumstances and (3) the purpose and flagrancy of the officers' misconduct. Id. These factors "are not meant to be exhaustive." Id. The underlying question "involves a pragmatic evaluation of the extent to which the

---

[31] See, e.g., Nardone v. United States, 308 U.S. 338, 341, 60 S. Ct. 266, 268 (1939).

illegal police conduct caused the defendant's response." Id. at 1310 (internal quotation marks omitted).

We turn first to the time that elapsed between the officers' entry and Mr. Smith's consent. Our case law reflects the commonsense principle that the more time that has elapsed between the illegal act and the defendant's consent, the more likely it is that the defendant's consent was untainted. Id. For example, we have suggested that a period of four days supports the conclusion that any taint from an illegal act is "completely attenuated." Devier v. Zant, 3 F.3d 1445, 1459 (11th Cir. 1993). By contrast, three minutes is an "extremely close temporal proximity." United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003). The record before us yields no precise time line with respect to the events in question. We do not know, for instance, how much time passed between the officers' initial entry into the home and the start of their discussion with Mr. Smith outside the front door. The record does suggest that, once Mr. Smith came outside and spoke with the officers outside his residence, four to five minutes elapsed before he led them into his house to show them the first (broken) laptop. Special Agent Ray then asked for and received permission to look at the laptop running in the living room. After Special Agent Ray identified file names indicative of child pornography and disconnected Mr. Smith's wireless router, he told Mr. Smith that

16

he was not under arrest and that he was under no obligation to speak with the officers. The magistrate judge's report, which was adopted expressly by the district court, put this warning at approximately eleven minutes into the interview.[32] At some later point in the conversation, after the officers and Mr. Smith again had exited the house, Mr. Smith filled out a written consent form. Only after that did he agree to be interviewed at the police station, where he made inculpatory statements. Although the record suggests no particular haste or delay, it is again unclear as to the times involved.

Absolute certainty about the elapse of time is not necessary, of course. Our prior cases make clear that the character of the interaction between the law enforcement agents and the defendant is relevant to our determination of how temporal proximity affects the underlying analysis. When an officer's interaction with an individual is highly intrusive, the passage of time is less likely to attenuate the officer's illegal act from the suspect's later consent. In United States v. Santa, 236 F.3d 662, 666 (11th Cir. 2000), officers unlawfully kicked in the locked front

---

[32] R.31 at 37. The magistrate judge's determination relied on the audio recording of Mr. Smith's interview that was introduced as an exhibit during the suppression hearing; that recording, however, is not in the district court docket and, therefore, is not a part of the record before us. Although neither party has suggested that the eleven minute estimate is inaccurate, let alone clearly erroneous, we note that the length of the recorded interview does not clarify fully the time line because the record suggests that there was some delay between when Mr. Smith exited his house to speak with the officers and when Sergeant Grimmich retrieved his audio recorder and began the recording. See R.33 at 31-32.

door of an apartment.  With their guns drawn, they ordered one occupant, Ramirez, to lay on the floor and proceeded to handcuff him.  Id.  Two to three minutes later, the officers told Ramirez--who was then sitting on the floor, still handcuffed--that they knew that there were drugs in the house and asked him to "just make things easy and tell [them] where the drugs were."  Id. (internal quotation marks omitted).  Ramirez then directed the officers to the drugs that later were used to convict him.  On appeal, we concluded that Ramirez's consent, even if voluntary, "did not purge the primary taint of the illegal entry and arrest."  Id. at 677.  In part, our decision was driven by the conclusion that the two- to three-minute separation between the officers' unlawful entry and Ramirez's consent was not "a significant lapse of time."  Id. at 678.

When the circumstances suggest a less intrusive interaction, however, a defendant's consent may be sufficiently attenuated from a prior illegal entry even if the time separating the two is relatively brief.  In United States v. Delancy, 502 F.3d 1297, 1301 (11th Cir. 2007), officers conducting an unlawful protective sweep of a house encountered an occupant, Godfrey, in or near a bedroom.  They spoke with her for approximately ten to twenty minutes before asking for her consent to search the home.  Despite the "relatively brief" time between the illegal entry and Godfrey's consent, we held that the two were sufficiently attenuated

18

such that Godfrey's consent was untainted by the illegal entry. Id. at 1311. We emphasized that, "[e]ven though the protective sweep and the consent were close in time, Godfrey was not handcuffed or detained. Moreover, the district court found that the interaction was conversational in tone, and that the officers did not threaten Godfrey in any way." Id. We acknowledged that the passage of time may be "more important in the calculus" under the more intrusive circumstances present in Santa, but, in light of the relatively unintrusive circumstances present in Delancy, we held that "timing [was] not the most important factor." Id.

The facts of this case more closely resemble Delancy than Santa. Although the officers had their guns drawn when they entered Mr. Smith's house, they carried them pointing toward the floor, without ever aiming them at Mr. Smith. When they first saw Mr. Smith, the officers stopped outside of his bedroom door and holstered their weapons.[33] Special Agent Ray appears to be the only officer who entered Mr. Smith's bedroom, and he did so only after Mr. Smith had awakened and had asked what the officers were doing.[34] After briefly explaining their presence, the officers left Mr. Smith's house entirely and waited outside

---

[33] We note that Mr. Smith has not introduced any evidence that suggests that he was aware, at any point during the encounter, that officers had drawn their firearms.

[34] This stands in marked contrast to Mr. Smith's description of an officer "standing over him" when he awoke. Appellant's Br. 3, 7.

19

while he dressed.  They reentered Mr. Smith's house only when he led them inside and exited again when he later wanted to smoke a cigarette.  At no point was Mr. Smith handcuffed or detained.  The district court found that the encounter remained conversational, and Mr. Smith has not suggested otherwise.  Delancy informs our conclusion that, although the time between the officers' initial entry and Mr. Smith's consent--uncertain as it is--may have been relatively brief, timing is not the most important factor under the facts of this case.

We next examine whether any intervening circumstances "interrupt[ed] the causal connection between the illegal act and the possibly tainted consent or confession."  Delancy, 502 F.3d at 1311.  As we just have noted in assessing the impact of the relatively brief time interval, the actions of the officers in withdrawing from the apartment immediately after ascertaining that Mr. Smith was at home assuaged significantly any impact of the initial entry on Mr. Smith's later cooperation.  The officers retreated outside the home to an area where they had a right to be and waited there until Mr. Smith dressed and joined them.  There is no indication in the record that they exploited in any way their initial presence in the home to identify the presence of evidence or to intimidate Mr. Smith into cooperating.

During the initial conversation outside the house and later upon reentry,

20

Mr. Smith offered to permit the officers to see a broken computer that he claimed to have been using at the time when, according to what the officers had told him, a Government monitoring program had identified the transmission of child pornography from his house. He then allowed them to look at the laptop running in his living room. At this point, Mr. Smith had not yet been informed that he had the right to refuse consent. After Special Agent Ray saw file names indicative of child pornography and disconnected Mr. Smith's wireless router, however, he told Mr. Smith that he was under no obligation to continue the interview. Before Mr. Smith consented to any further searches, he signed a written consent form provided by Sergeant Grimmich. Only after being warned, both orally and in writing, did Mr. Smith permit the officers to search his home and to retrieve, for later review, other digital media storage devices. He later consented to be driven to and interviewed at the police station, and, once there, he was read his Miranda warnings before being questioned.

Although Mr. Smith did not receive significant warnings at the onset of the encounter, the record is devoid of any suggestion that the officers' conduct during this period interfered with his making "a knowing, intelligent, and voluntary choice to [consent] in the absence of any coercion or threats from the police."

Delancy, 502 F.3d at 1312.[35]  The absence of any such evidence militates in favor

of concluding that the causal connection between the officers' initial entry and

Mr. Smith's "consent had 'become so attenuated as to dissipate the taint.'"  Id.

(quoting Wong Sun, 371 U.S. at 487, 83 S. Ct. at 417).

The last of the enumerated factors focuses on the purpose and flagrancy of

the officers' conduct.  Mr. Smith submits that a reasonable conclusion can be

made that the officers entered his home to obtain access to the computer

equipment inside his residence and, therefore, that his consent is tainted.[36]

However, we are bound by the district court's factual finding "that although the

officers went to [Mr. Smith's] home for a 'knock and talk' to attempt to gain more

information about the tip linking him to the viewing and transmission of child

pornography, the officers actually entered the residence to check on [Mr. Smith's]

---

[35]  We acknowledge, of course, that Special Agent Ray lied to Mr. Smith by suggesting that a government monitoring program had identified that child pornography had been transmitted from his residence.  Law enforcement officers may use deception as a valid investigative technique so long as they do not present the misrepresentation as "a coercive threat."  United States v. Farley, 607 F.3d 1294, 1328 (11th Cir. 2010).  Perhaps more importantly, the record suggests no basis upon which we could conclude that Special Agent Ray's misrepresentation was related to the officers' entry into the home; "there is no suggestion that the police exploited" information that they obtained from the initial entry.  United States v. Delancy, 502 F.3d 1297, 1313 (11th Cir. 2007).  For example, they did not use anything they happened to see inside the duplex to bolster the deception.

[36]  Reply Br. 6-7.

welfare."[37]  Mr. Smith has presented no evidence to support the proposition that the district court's finding was clearly erroneous, and his bare assertion that a different conclusion would have been reasonable is insufficient to overcome the deference due to the district court's factual findings.  In this case, as in Delancy, "we have assumed arguendo that the entry itself was unlawful, [but] the district court's findings make clear that the police did not enter for an unlawful purpose." Id. (emphasis in original).  So understood, the purpose of the officers' entry militates against concluding that Mr. Smith's consent was tainted.

The officers also did not act flagrantly.  Once inside Mr. Smith's residence, they proceeded directly to his bedroom to check his welfare.  They did not search his house for computers or digital storage devices, nor did they touch, much less examine, the laptop computer sitting in plain view in his living room.  Once they had satisfied themselves that Mr. Smith was in no danger, the officers exited the house and remained outside until he led them back in.  With the exception of their initial entry into the residence, the officers' interaction with Mr. Smith is a paradigmatic example of a consensual knock-and-talk.

After considering the totality of the circumstances, paying particular attention to the factors that we previously have enumerated, we conclude that the

---

[37]  R.38 at 6 n.2.

officers' entry did not taint Mr. Smith's admittedly voluntary consent.

## Conclusion

Even assuming that the officers' initial entry into Mr. Smith's home violated the Fourth Amendment, suppression is unwarranted because Mr. Smith's later consent was not tainted by the entry.  We therefore affirm the judgment of the district court and Mr. Smith's conviction.

**AFFIRMED.**