*1288 MARTIN, Circuit Judge,
with whom WILSON, ROSENBAUM and JILL PRYOR, Circuit Judges, join, dissenting from the denial of rehearing en banc:
This case arises out of the fatal police shooting of an innocent young man. Andrew Scott and his girlfriend were in their home playing video games late one night when police arrived outside. The police had no warrant and no reason to suspect Mr. Scott or his girlfriend had committed any crime. The officers acknowledge both of these things to be true. Even so, the police tactically surrounded the home’s only exit, drew their guns, repeatedly slammed on the door without identifying themselves as law enforcement, and then shot and killed Mr. Scott when he opened the door, as he was stepping back into his home. The District Court rejected the 42 U.S.C. § 1983 claims brought by Mr. Scott’s bereaved parents and girlfriend, holding that the police acted reasonably. A panel of this Court affirmed in a three-sentence, unpublished opinion, and now a majority of this Court’s judges have voted not to rehear the case en banc. I dissent from that decision.
There are problems with the holdings that the panel summarily affirmed. I will turn my attention to two. First, under no standard was it reasonable for the police to kill Mr. Scott when he answered the knock at the door to his home. He was not suspected of any crime (much less a violent crime) and he was standing inside his own house without threatening them. Second, the police were not engaged in a permissible “knock and talk” when they killed Mr. Scott. Their aggressive tactics crossed far over the line from a consensual visit into a warrantless raid. When it upheld these rulings by the District Court, the panel (and now a majority of this Court) gave a pass to dangerous, unconstitutional police actions in a way that makes it more likely that tragic police shootings will continue to occur.
I.
While two members of the panel have now written extensively about why Mr. Scott’s survivors should be barred from presenting their case to a jury, the panel opinion set forth no facts about this case. Now that we are reviewing the record, it reveals hotly disputed facts that are central to deciding whether qualified immunity protects these officers from facing a jury in a civil trial. See Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013). Viewed in the light most favorable to the plaintiffs, see Perez v. Suszczynski, 809 F.3d 1213, 1217 (11th Cir. 2016), the material facts are as follows:[1]
Deputy Richard Sylvester, of the Lake County Sheriffs Office in Florida, saw a motorcycle speeding down a street one night and started after it in his patrol car. Because the motorcycle had a head start, Deputy Sylvester quickly realized that his car was never going to catch up, and he *1289 abandoned pursuit when the motorcycle pulled out of sight. Deputy Sylvester never identified the speeding motorcycle, or even saw what color it was.
After the failed chase, the police dispatcher speculated with Deputy Sylvester that the speeding motorcycle “might possibly” have been the same one used by an armed assault and battery suspect in a different area, about five miles away. This possible connection between the two motorcycles was not then investigated. The officers just assumed they were one and the same. Later, another officer radioed Deputy Sylvester and speculated that he had found “the” motorcycle at Blueberry Hill Apartments.[2] The officer noted that the motorcycle at Blueberry Hill Apartments was hot on this July night, which he took to mean that it had been driven recently.
Deputy Sylvester then drove to Blueberry Hill Apartments. After arriving, he saw a motorcycle parked in the apartment complex’s shared parking lot.[3] Deputy Sylvester ran a tag search on the motorcycle and found that it was registered to an address in a different city, as was a car parked next to it. The tag search revealed no incriminating information. The time was around 1:30 a.m., and there were four officers on the scene.
The officers decided to “knock on doors at the complex and try to gather information.” They chose to start with Apartment 114 because a light was on inside and it was located near where the motorcycle was parked in the shared lot.[4] The officers had no warrant, no idea which apartment *1290 the motorcyclist might be in (if any),[5] and no reason to suspect the occupants of Apartment 114 of any crime. Indeed, they later acknowledged that “the occupants of Apartment [114] were not suspects.” Meanwhile, inside Apartment 114, Mr. Scott and his girlfriend, Miranda Mauck, were playing video games in their pajamas. Neither of them owned a motorcycle. They were just living their lives in the privacy of their home.
The four police officers assumed “tactical positions” surrounding the only door to Apartment 114. Their guns were all drawn and ready to shoot. Deputy Sylvester stood to the left of the door, up against the exterior wall, while a second officer stood in a mirrored position to the right. The two other officers stood behind a nearby privacy fence. None of the officers stood on the raised concrete slab in front of the door, where a visitor would stand. None of the patrol cars displayed emergency lights, and the area around Apartment 114 was dark enough that two of the officers used flashlights.
Deputy Sylvester, holding his drawn gun by his leg, pounded repeatedly on the door of Apartment 114 with his other hand. Neighbors hundreds of feet away described the knocks as “very loud,” as did Ms. Mauck.[6] One officer testified that the knocks sounded loud because the door was hollow. The officers never identified themselves as law enforcement. Drawn outside by this late-night commotion, a neighbor told the officers that the motorcycle’s owner “lives over there,” gesturing toward a different building. Deputy Sylvester heard this but apparently did not see the gesture.
Inside Apartment 114, Mr. Scott and Ms. Mauck were startled by this anonymous pounding on their door at 1:30 a.m. They went to their bedroom to change out of their pajamas, and when the pounding continued, Mr. Scott retrieved a handgun. There were no sirens or emergency lights to alert him to a police presence,[7] and there is no evidence that Mr. Scott knew police were surrounding his door in the middle of the night.
What happened next took place within about two seconds. Mr. Scott began opening his door inward at medium speed while holding his gun pointed safely down at the ground.[8] At no point did Mr. Scott raise *1291 his gun or step outside of his home. To the contrary, as soon as Mr. Scott saw Deputy Sylvester — a shadowy figure hiding outside his door, clutching a pistol — Mr. Scott began retreating inside and closing his door. This seems like a normal enough response, but Deputy Sylvester says he viewed Mr. Scott’s retreat as an attempt to “get a position of cover [behind the door] where he can engage me.”[9] Deputy Sylvester started shooting "without warning. He rapidly fired six bullets. Three hit Mr. Scott. Mr. Scott- collapsed onto his couch, where he died from his injuries. Mr. Scott never fired a shot. In fact, he never even chambered a round so his gun could fire.
II.
Qualified immunity protects officers only when they do not violate the victim’s clearly established rights. Perez, 809 F.3d at 1218. Courts are tasked with a two-part inquiry when deciding whether qualified immunity applies: (1) do the facts alleged, construed in the light most favorable to the plaintiffs, establish that a constitutional violation occurred; and (2) was the violated constitutional right clearly- established. Id. A right may be clearly established by an existing decision of the Supreme Court, this Court, or the state high court. Valderrama v. Rousseau, 780 F.3d 1108, 1112 (11th Cir. 2015). For a right to be clearly established, “there need not be a case on all fours, with materially identical facts”; indeed, there can be “notable factual distinctions” between the precedent and the case before the court. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1278 (11th Cir. 2004) (quotations omitted). Although the Supreme Court recently reminded us that “clearly established law should not be defined at a high level of generality,” it also restated the exception to this rule: “general statements of the law” can still create clearly established law in “obvious case[s].” White v. Pauly, 580 U.S. -, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017). We have said that officials need only have “reasonable warning” that their conduct violated constitutional rights. Holloman, 370 F.3d at 1278 (quotation omitted); see also United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (“[GJeneral statements of the law are not inherently incapable of giving fair and clear warning....”).
In considering whether the facts alleged show a violation of clearly established law, we must remember to “view all evidence and factual inferences in the light most favorable to the non-moving party.” Perez, 809 F.3d at 1217. That means where there are “varying accounts of what happened,” the proper standard requires adoption of the account most favorable to the non-movants. Id.; see also Feliciano v. City of Miami Beach, 707 F.3d 1244, 1252 (11th Cir. 2013).
III.
Contrary to what the District Court found, there were two clear constitutional violations here. First, the reflex shooting and killing of Mr. Scott, as he opened the door to his house then tried to step back inside, was manifestly unreasonable under these circumstances. Second, the aggressive police tactics that led to this tragedy far exceeded the scope of a consensual, *1292 information-gathering “knock and talk.” By accepting these violations as business as usual, the panel opinion weakens core constitutional rights and gives dangerous guidance to police officers.
A. Excessive Force
The use of deadly force is a per se seizure under the Fourth Amendment. That being the case, the courts are left to decide only whether the force was reasonable in the circumstances. See Tennessee v. Garner, 471 U.S. 1, 7-8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). “To determine the constitutionality of a seizure we must balance the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.” Id. at 8, 105 S.Ct. at 1699 (quotation omitted) (alteration adopted). In considering the government’s interests, this balancing test looks at “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Ultimately, “[t]he ‘reasonableness’ of a particular use of force must be judged from the perspective of a reasonable officer on the scene,” and the inquiry “is an objective one.” Id. at 396-97, 109 S.Ct. at 1872.
Viewing the facts most favorably to these plaintiffs, Deputy Sylvester rapidly fired six bullets at Mr. Scott: (1) who was admittedly not a suspect, (2) who was committing no crime, (3) who was in his own home, (4) with no warning, (5) almost as soon as he opened his door, and (6) as he was stepping back into his home. Or, to use the Graham balancing test, Mr. Scott was not engaging in any crime (much less a severe one), was not actively resisting arrest, and was not attempting to flee, though Deputy Sylvester thought Mr. Scott posed a threat. On the other side of the scale, Deputy Sylvester effected the greatest deprivation there is — he killed Mr. Scott. The District Court held that this killing was objectively reasonable because Deputy Sylvester thought Mr. Scott was a threat when he “saw a man holding a gun.” The court relied almost exclusively on the fact that Mr. Scott had a gun, calling it “the most critical fact in this case.” The court even placed blame on the victim: “Andrew Scott made a fateful decision that night: he chose to answer his door with a gun in his hand. That changed everything. That is the one thing that— more than anything else — led to this tragedy.”
The District Court’s conclusion that the use of deadly force was reasonable in these circumstances is wrong for several reasons. First, the District Court’s conclusion of objective reasonableness on the part of the officers is wrong as a matter of clearly established Fourth Amendment law. The fact that a person has a gun does not, by itself, decide the excessive-force question. This Court recently confirmed that “the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit.” Perez, 809 F.3d at 1220. While the presence of a weapon may certainly be a part of the excessive-force analysis, “the ultimate determination depends on the risk presented, evaluating the totality of the circumstances surrounding the weapon.” Id.
In circumstances closely resembling this case, this Court held that an officer’s use of deadly force was excessive even though the victim had a gun. In Lundgren v. McDaniel, 814 F.2d 600 (11th Cir. 1987), a husband and wife who owned a video store slept behind a desk in the store one night *1293 because a store window had been broken during the day. Id. at 602. Mr. Lundgren had a handgun with him. Id. Around 2:00 a.m., two deputy sheriffs noticed the broken window and entered the dark store without announcing themselves. Id. When Mr. Lundgren heard glass crunching and began to rise from behind the desk with his gun, one of the deputies shot him to death. Id. Mr. Lundgren never fired his gun. Id. Just like Mr. Scott, Mr. Lundgren was (1) not a suspect, (2) committing no crime, (3) on his own property, (4) killed without warning, and (5) shot immediately after he presented himself with a gun. This Court rejected the argument that the officers acted reasonably by shooting Mr. Lundgren, noting that it would be different if Mr. Lundgren had threatened the officers with his gun. See id. at 602-03. Thus, the fact that Mr. Lundgren responded to the police’s late-night disturbance with a gun did not justify his instant death.
Despite Lundgren’s similarity to this case, neither the District Court nor the panel ever mentioned it. Now the concurrence says Lundgren is different from Mr. Scott’s case because here there was an “advance report of a speeding motorcyclist involved in an assault and battery with a loaded firearm,” while in Lundgren there was no advance report of a potentially armed burglary suspect in the store. Conc. Op. at 1283. This leads to the concurrence’s theory (never expressed in the panel opinion) that Deputy Sylvester “had reason to think” that the premises contained someone who was “armed and dangerous” based on the advance report, while the officers in Lundgren had no such reason. Id. at 1283. Although a valiant effort, this distinction is immaterial. A broken storefront window indicates trouble and possible danger in the same way an advance report would. Indeed, a broken window foreshadows danger at a specific location, unlike this case, where Mr. Scott’s home came to the officers’ attention by way of the fickle finger of fate I’ve described. The officers who came to Mr. Scott’s home had no good reason to identify the person in Apartment 114 as the armed motorcyclist. They even acknowledged later that “the occupants of Apartment [114] were not suspects.”
The concurrence also says Lundgren is not like Mr. Scott’s case because whether the storeowner in Lundgren even had a gun was disputed. Id. at 1283. But in its analysis, Lundgren emphasized that the parties there “sharply contested” whether the storeowner “threatened the officers with a weapon,” so a jury “could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon.” 814 F.2d at 603. This idea is present in Mr. Scott’s case as well. Although the parties do not dispute that Mr. Scott held a gun, they do dispute whether Mr. Scott threatened or appeared to threaten Deputy Sylvester with the gun.[10]
There is also related Eleventh Circuit precedent, Menuel v. City of Atlanta, 25 F.3d 990 (11th Cir. 1994), in which this Court rejected an excessive-force claim where the suspect actually shot at police, but noted that the police did not act aggressively toward another member of the same household who held a gun in his own home. Police responded to a call around midnight about a “violent and demented” suspect. Id. at 991. When the police arrived, the suspect opened the door and *1294 lunged at them with a butcher knife, then locked herself in a bedroom. Id. at 992. The police entered the bedroom intending to capture her, but she unexpectedly began firing a gun at them. Id. at 993. The police returned fire and killed the suspect. Id. On these facts, this Court held that the officers’ use of force was objectively reasonable, noting that the officers “proceeded slowly, cautiously, and precisely, resorting to deadly force only when assaulted with deadly force.” Id. at 996. We also noted that the officers “took no unusual or aggressive action” toward the suspect’s father when he came out of his bedroom “understandably startled” at the late-night disturbance, even though the father had a loaded shotgun. Id. at 996 n.9.
On its own, Lundgren shows that Deputy Sylvester violated Mr. Scott’s clearly established constitutional rights. And when viewed together, Lundgren and Menuel demonstrate the straightforward line courts observe, with people holding a gun in their own house as a constitutionally guaranteed tool of self-defense on one side,[11] and people who go beyond that to menace police with their gun on the other. The Supreme Court also drew this line in Garner, one of the seminal excessive-force cases. See 471 U.S. at 11, 105 S.Ct. at 1701 (prohibiting deadly force where “the suspect poses no immediate threat to the officer [or] to others,” but allowing it where “the suspect threatens the officer with a weapon”). On the facts as we must view them here, Mr. Scott was on the right side of this line because he did not threaten the officers with his gun. He merely held it pointing safely at the ground while he was in his own home, and he had even started to retreat. Deputy Sylvester immediately reacted by rapidly firing six bullets at Mr. Scott, killing him practically the moment he opened the door. Under our caselaw, this was not even close to reasonable.[12]
To reach the opposite conclusion, -the District Court relied on the fact that Mr. Scott was backing inside his home when he was killed. That court relied on Deputy Sylvester’s subjective belief that Mr. Scott was backing inside to take cover for a gun battle, and the concurrence parrots this point of view. Conc. Op. at 1278-79. I find it surprising that the concurrence accepts the officers’ killing of Mr. Scott based on his retreat into his home. Yet both the District Court and the concurrence endorse the view that Deputy Sylvester’s decision to shoot Mr. Scott dead was objectively reasonable because an officer in Deputy Sylvester’s place “could have reasonably perceived” that Mr. Scott’s retreat “was an attempt to take cover to fire.” Id. at 1279.
This faulty conclusion illustrates the mistake the District Court made (and the concurrence now endorses) in its qualified immunity analysis. The only fact available to us in reviewing this case is that Mr. Scott stepped back after opening the door. Deputy Sylvester’s perception that Mr. Scott retreated in order to take cover and fire at him is nothing more than the officer’s subjective belief. The law of qualified immunity forbids us from deciding this case based on Deputy Sylvester’s subjective beliefs. The proper legal inquiry is an *1295 objective one, and an officer’s subjective beliefs cannot “make an objectively unreasonable use of force constitutional.” Graham, 490 U.S. at 397, 109 S.Ct. at 1872. So even if Mr. Scott’s retreat actually put Deputy Sylvester in fear of imminent harm, we cannot rely on an officer’s subjective belief that his life was in danger “to objectively determine the reasonableness of his actions.” Perez, 809 F.3d at 1220. Instead, we are confined to objective “facts and circumstances.” Id. Given the officers’ knowledge that the door to Apartment 114 was hollow, Deputy Sylvester’s subjective belief that Mr. Scott moved behind this hollow door as if to fire is not objectively reasonable, particularly when Mr. Scott’s movement was entirely consistent with retreat into his home. And in any case, blindly accepting Deputy Sylvester’s beliefs as objectively reasonable at the summary judgment stage draws an impermissible inference in his favor. Any ambiguity surrounding the fact of Mr. Scott’s retreat should have been resolved in favor of the plaintiffs. See Perez, 809 F.3d at 1217. It is the job of a jury to decide why Mr. Scott was backing inside his home; So too must a jury decide whether Deputy Sylvester’s subjective belief was objectively reasonable.
In addition to these Fourth Amendment concerns, the District Court’s conclusion that deadly force was reasonable here also plainly infringes on the Second Amendment right to “keep and bear arms.” See District of Columbia v. Heller, 554 U.S. 570, 592, 635, 128 S.Ct. 2783, 2797, 2821-22, 171 L.Ed.2d 637 (2008) (finding that the Second Amendment “guarantee[s] the individual right to possess and carry weapons in case of confrontation,” and concluding that a ban on handgun possession and use for self-defense in the home violates this constitutional guarantee). If Mr. Scott was subject to being shot and killed, simply because (as the District Court put it) he made the “fateful decision” to answer a late-night disturbance at the door to his house, and did so while holding his firearm pointed safely at the ground, then the Second Amendment (and Heller) had little effect.
B. Warrantless Raid
The Fourth Amendment’s protections are, and always have been, at their apex in the home. See Kyllo v. United States, 533 U.S. 27, 34, 121 S.Ct. 2038, 2043, 150 L.Ed.2d 94 (2001) (describing the home as “the prototypical ... area of protected privacy”); Wilson v. Layne, 526 U.S. 603, 610, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (“The Fourth Amendment embodies th[e] centuries-old principle of. respect for the privacy of the home.”); United States v. U.S. Dist. Ct. for E.D. Mich., 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) (“[P]hysical entry of the home is the chief evil against which the ... Fourth Amendment is directed.”). The Constitution guarantees “the right of a man to retreat into his own home and there be free from unreasonable government intrusion.” Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961). Mr. Scott did nothing more than exercise this right when police officers converged on his home without a warrant and killed him.
The officers argued — and the District Court held — that this warrantless intrusion was constitutional under the “knock and talk” exception to the Fourth Amendment’s warrant requirement. A knock and talk is a .consensual encounter between police who seek to gather information and a civilian, which takes place at the civilian’s home.[13] See United States v. Smith, 688 *1296 F.3d 730, 734 (11th Cir. 2012). In Florida v. Jardines, 569 U.S. —, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013), the Supreme Court discussed the legal basis for the knock and talk exception.[14] It stated that a knock and talk is authorized by longstanding social custom, which creates an implied license for a “visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.” Id. at 1415. The Court emphasized that knock and talks, when conducted in this way, are allowed “precisely because [it] is ‘no more than any private citizen might do.’ ” Id. at 1416 (quoting Kentucky v. King, 563 U.S. 452, 469, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011)). This Court has recognized the same legal basis for knock and talks. See United States v. Walker, 799 F.3d 1361, 1368 (11th Cir. 2015) (per curiam).
When officers exceed the scope of the implied license for visitors to approach and knock, however, they may no longer claim shelter under the knock and talk exception to the Fourth Amendment’s warrant requirement. In Jardines, the officers exceeded the scope of the implied license by bringing a drug-sniffing dog onto the defendant’s porch. 133 S.Ct. at 1416 & nn.3-4. The Supreme Court said “[t]here is no customary invitation to do that”; whereas “a visitor knocking on the door is routine,” a visitor acting like the officers “would inspire most of us to — well, call the police.” Id. at 1416. The Court’s decision turned on the officers’ violation of “background social norms,” which showed that the scope of the license was exceeded. Id. And it noted that the scope of the license was not exceeded merely because a drug-sniffing dog was used — rather, “a typical person would find it a cause for great alarm ... to find a stranger snooping about his front porch with or without a dog.” Id. at 1416 n.3 (quotation omitted). This Circuit has also recognized that exceeding the scope of a knock and talk is illegal. See Walker, 799 F.3d at 1363.
The officers in Mr. Scott’s case try to shoehorn their tactics into the knock and talk exception, saying that they only intended to ask for information as visitors, and they would have left Apartment 114 if no one had answered. The District Court and the panel accepted these statements and, in the process, rejected the plaintiffs’ claims. But the facts, properly viewed in the light most favorable to the plaintiffs, tell a very different story. Unlike consensual visitors, the officers: (1) approached Mr. Scott’s home at 1:30 a.m.; (2) tactically surrounded the only exit; (3) drew loaded guns; and (4) repeatedly slammed on the door without identifying themselves. These aggressive tactics did not fit into the implied license to approach and knock. Just like Jardines, there is no customary invitation to do that. Rather, seeing people outside your door at 1:30 a.m., in the dark, holding loaded guns, would be “a cause for great alarm” and would “inspire most of us to[ ] call the police.” Jardines, 133 S.Ct. at 1416 & n.3. In circumstances like these, the implied consent underlying the knock and talk exception disappears, because no “background social norms” could possibly validate the officers’ conduct. To the contrary, American social norms and laws empower people to protect themselves from armed intrusions into their homes.[15]
*1297 The officers here weren’t ready to talk with Mr. Scott — they were ready for a raid.[16] Even setting aside the fact that Deputy Sylvester killed Mr. Scott before any talking at all, would Mr. Scott have been free to “refuse to answer any questions at any time,” as is necessary for a knock and talk to be lawful? King, 563 U.S. at 470, 131 S.Ct. at 1862. Was he under “no obligation to open the door” even though the officers kept slamming on it in the middle of the night, so long and forcefully that even Mr. Scott’s neighbors woke up and came outside? Id. at 469-70, 131 S.Ct. at 1862. Under the circumstances, I think not.
The concurrence’s claim that these officers, who tactically surrounded Mr. Scott’s home with their guns loaded, were there to greet Mr. Scott and chat, Conc. Op. at 1284-85, is flatly inconsistent with its other claim that the officers were entitled to conclude that the armed motorcyclist may have been inside Apartment 114. Conc. Op. at 1276-78, 1278-79. The concurrence tries to have it both ways: for the excessive-force violations, it says the officers had every reason to think there was an armed and dangerous criminal in Apartment 114. Then for the knock and talk violation, it says the officers were just there for a friendly talk with people who “were not suspects.” Conc. Op. at 1277. Which is it?
The combination of police tactics used here is egregious. As far as I can tell, no Court of Appeals has reviewed a knock and talk case involving all the aggressive tactics used here, namely: (1) approaching well after midnight; (2) taking tactical positions to the sides of a home’s only exit; (3) drawing guns; and (4) forcefully knocking without identifying themselves. Cases that seem to come to the attention of the courts, for the most part, involve officers using one of these tactics during a purported knock and talk. Even in isolation, tactics like those used by the officers here have met with criticism.
For instance, United States v. Lara-Mondragon, 516 Fed.Appx. 771 (11th Cir. 2013) (per curiam), is an unpublished case from this Circuit that addressed only one of the tactics used here.[17] The officers arrived at the home of an armed suspect, and the suspect fled into his home. Id. at 771-73. The officers assumed positions “along both sides of the residence,” rather than on the doorstep. Id. at 771-72. This Court considered whether the officers’ positioning made the knock and talk illegal, but found it did not because the suspect fled into his home after seeing police and was known to have a gun, which raised officer safety concerns.[18] Id. at 773. We also approved the knock and talk because “no weapons were drawn” by police during the encounter. Id. Thus, even when three of the four aggressive tactics seen in this case were not used, we still suggested that the outcome could have been different if the officers had drawn guns.
*1298 While the concurrence dismisses what I say here by pointing out that I “rely” on out-of-circuit cases, I do not. Conc. Op. at 1286. That said, I do find value in looking at how knock and talk cases are evaluated across the country. And other courts have stressed the importance of police not drawing their guns during information-gathering, consensual knock and talks. See, e.g., United States v. Gomez-Moreno, 479 F.3d 350, 355 (5th Cir. 2007) (“The purpose of a ‘knock and talk’ is not to create a show of force ... nor to raid a residence.”); United States v. Thomas, 430 F.3d 274, 278 (6th Cir. 2005) (“Thomas responded to a simple knock and request, not an order to emerge or the threat of firearms.”); United States v. Spence, 397 F.3d 1280, 1284 (10th Cir. 2005) (concluding that a knock and talk did not constitute a seizure partly because the officers “did not display their weapons at any time”). The lack of support for conducting knock and talks with drawn guns is hardly surprising, given that a knock and talk is, by definition, a consensual encounter. See Smith, 688 F.3d at 734. Having a gun pointed at you removes the possibility of consent. Demonstrating this principle, I have found only one (unpublished) Circuit case approving a knock and talk where an officer drew his gun before knocking, and that court’s approval was grudging. See United States v. Flores-Castaneda, 384 Fed.Appx. 364 (5th Cir. 2010). And even for this one case, the court noted, “if the officers truly were uncertain about whether criminal activity was taking place inside a house [as is required by the knock and talk exception], they would not approach it with guns drawn.” Id. at 368. While the Fifth Circuit said it “might well” find the knock and talk unreasonable in the first instance, it deferred to the district court’s credibility determinations and factual finding because it was bound by the standard of review for a suppression hearing.[19] Id. at 368-69.
The lateness of the hour also affects the reasonableness of a purported knock and talk. It is one thing to “openly and peaceably, at high noon, [] walk up the steps and knock on the front door.” United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir. 1991) (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964)). It is another to go to a person’s door in the middle of the night. American “law and legal traditions long have recognized the special vulnerability of those awakened in the night by a police intrusion at their dwelling place.” United States v. Jerez, 108 F.3d 684, 690 (7th Cir. 1997). For example, in United States v. Lundin, 817 F.3d 1151 (9th Cir. 2016), officers conducted a knock and talk at 4:00 a.m. Id. at 1154. The court concluded that this tactic exceeded the scope of the implied license to approach and knock because “unexpected visitors are customarily expected to knock on the front door of a home only during normal waking hours,” and there was no evidence that the officers had a reason for knocking that “a resident would ordinarily regard as important enough to warrant an early morning disturbance.” Id. at 1159; see also United States v. Wells, 648 F.3d 671, 680 (8th Cir. 2011) (treating the fact that a knock and talk was conducted at 4:00 a.m. as a factor showing unreasonableness); United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008) (“This [knock and talk] began between 2:30 and 3:00 in the morning, a time which must be taken into consideration when analyzing *1299 the coerciveness of the encounter.” (emphasis added)). Florida courts also recognize that a late-night knock and talk may be coercive.[20] See, e.g., Hardin v. State, 18 So.3d 1246, 1248 (Fla. 2d DCA 2009).
The concurrence says the cases I’ve cited do not apply here because those' cases involved officers “using a coercive show of force” to enter homes without warrants. Conc. Op. at 1286. Then, in comparing this case to Gomez-Moreno, the concurrence concludes that the officers’ actions here “do not rise to the level of a ‘show of force’ ” because (1) Deputy Sylvester “did not have a helicopter hovering overhead”; ánd (2) although the hour was late, the lateness did not make the officers’ actions a “raid” because “the lights were on in the apartment.” Id. at 1287. I was not aware that private citizens could immunize themselves from police raids by simply flipping a light switch. Neither did I know that the police could avoid a “show of force” by leaving their helicopters at home.
Considering all of the circumstances here, the aggressive tactics used exceeded the scope of the implied license to approach Mr. Scott’s home and knock. The police’s warrantless intrusion therefore violated the Constitution. Perhaps if this purported knock and talk had only been late at night (as in Walker), or had only involved the officers assuming tactical positions (as in Lara-Mondragon), we would have a different case. But the officers here did all of these things: (1) approached Mr. Scott’s home at 1:30 a.m.; (2) tactically surrounded his only exit; (3) drew loaded guns; and (4) repeatedly slammed on the door without identifying themselves.[21] Although there are court rulings addressing different aspects of the behavior here, I found no case in which law enforcement did all of these things at once. The concurrence says I have not cited cases that are factually similar to this one. See Cone. Op. at 1285-86. There are not a lot of cases like this, and I hope that is because police don’t often shoot and kill innocent people who answer a knock at their door. It is the job of this Court to identify cases in which unconstitutional police tactics led to the senseless loss of life, and then let juries sort out how things went wrong.[22]
[[Image here]]
I appreciate that police must make difficult decisions in tense situations. And that is why qualified immunity often shields them from suit. But there are limits to this doctrine. When police clearly violate a person’s constitutional rights, as here, it is our role to confront that violation of the law and to ensure as best we can that it is not repeated. I don’t believe the panel’s summary affirmance, performed that role. Instead, it gave a pass as reasonable to the actions of police in surrounding a randomly selected home in the dead of night, occupied by someone not a suspect; draw *1300 ing loaded weapons; pounding on the door until the beleaguered occupant opened it; and then shooting him on sight, only because he was holding a gun. If these actions are constitutional, as the panel suggests, then the Second and Fourth Amendments are having a very bad day in this Circuit.
I respectfully dissent.

. Although the concurrence to the denial of rehearing en banc says that Judge Jill Pryor and I have "omit[ted] key, undisputed facts,” Cone. Op. at 1275, Judge Hull's account of the facts almost exactly echoes my account. The fact that we draw such divergent conclusions from our similar understanding of the facts highlights the need to have a jury decide this case. The concurrence does point to a few additional bits of information, some of which it labels as "undisputed facts.” I don’t view them as undisputed, but even accepting the concurrence’s facts, this case cries out for a jury.

. From a reasonable officer’s perspective at this point, there were as many as three different motorcycles in play: (1) the speeding motorcycle that Deputy Sylvester never identified during his failed pursuit; (2) the motorcycle used by an assault and battery suspect in another area and reported secondhand from the Leesburg Police Department; and (3) the motorcycle at Blueberry Hill Apartments. The concurrence suggests that the officers reasonably assumed they were all the same. Given that there were 12,143 motorcycles registered just in Lake County, Florida, at the time Mr. Scott was killed, this assumption was questionable. See Florida Highway and Motor Vehicles Registration Statistics, July 1, 2012, http://flhsmv.gov/html/reports_and_statistics/ CVR/12-13/CVR-07-2012 .pdf.

. The concurrence cites as an undisputed fact that Deputy Sylvester "positively identified]” the motorcycle at Blueberry Hill Apartments as the speeding motorcycle from his failed pursuit. Cone. Op. at 1275-76. However, this conflicts with Deputy Sylvester’s sworn testimony that he never saw the speeding motorcycle’s make, model, or color. Where there are conflicting accounts, we construe the facts in the light most favorable to the non-movant (here, the plaintiffs). Perez, 809 F.3d at 1217. We must therefore reject Deputy Sylvester’s claim of positive identification.

. At least one of the officers knew that the parking spots at Blueberry Hill Apartments were not assigned, but were instead shared throughout the whole complex. Anyone could park anywhere.
The concurrence says "Deputy Sylvester observed a fresh footprint in the sand next to the motorcycle leading toward [Apartment] 114.” Conc. Op. at 1277. Once again, this is not an undisputed fact. None of the other three officers on the scene backed up his story of a "fresh footprint.” When Corporal McDaniel was specifically asked if he saw anything that connected the motorcycle with Apartment 114, he said he usually pays attention to tracking clues like “an obvious footprint,” but reported none here. Curiously, Judge Hull acknowledges that "[o]ther officers do not recall seeing a footprint” but lists the purported footprint in her section of "undisputed” facts anyway. Conc. Op. at 1277. We are not permitted to construe this equivocal and unsupported testimony against Mr. Scott. Even if we could, a footprint would suggest only that someone, at some time, walked from the shared parking lot toward the building shared by Apartment 114. What to infer from that is something a jury should decide.

. The concurrence includes one of several photographs from the record on summary judgment for the apparent purpose of supporting the connection the officers made between the motorcycle and Mr. Young’s apartment. Conc. Op. at 1276. But this is fact finding. The extent to which any photograph may or may not' support the police officers' reasons for approaching Mr. Scott’s home should be resolved by a jury. And in any event, wherever this motorcycle was parked, it hardly justified the killing of Mr. Scott.

. Deputy Sylvester says that he knocked “in a normal manner” because he was concerned about waking children inside. However, Ms. Mauck, neighbors, and a fellow officer stated that the knocks were loud, so we must once again discredit a contradicted claim of Deputy Sylvester. His statement also leads one to wonder why Deputy Sylvester readied himself for a shootout if he thought children were inside.

. The concurrence says the officers parked their patrol vehicles "in plain view outside Apartment 114” and that "[tjhere was a front window next to the front door of 114.” Conc. Op. at 1277. This suggests that Mr. Scott was aware of police presence. Once again, the record we have is more complicated than this. In her deposition, Ms. Mauck said she believed there was a fan in the living room window the night of the shooting. A fan could have obstructed Mr. Scott’s view of the police cars, so construing the evidence in the light most favorable to plaintiffs, we must assume here that police cars were not visible from that window.

. Deputy Sylvester claimed that Mr. Scott "flung open” the door and "was standing *1291 there with his arm extended and a semiautomatic pistol pointed straight at my face.” Yet again, Deputy Sylvester’s claim conflicts with other record evidence, so we cannot rely on it.

. As mentioned, one of the officers testified that the door was hollow, a quality that Deputy Sylvester may have observed while knocking.

. The concurrence also says that unlike in Lundgren, the officers here "knocked on the door first and did not enter ... unannounced.” Cone. Op. at 1283. That’s factually incorrect. Although Deputy Sylvester did knock on the door, the officers never identified themselves as law enforcement. Knocking and announcing are two different things.

. See District of Columbia v. Heller, 554 U.S. 570, 628, 128 S.Ct. 2783, 2817, 171 L.Ed.2d 637 (2008) (stating that the home is "where the need for defense of self, family, and property [with a gun] is most acute”).

. For a recent case confirming this proposition, see Ayers v. Harrison, 650 Fed.Appx. 709, 715, (11th Cir. 2016) (per curiam) ("Instead of evaluating whether [the victim] was a true threat — or was simply scared of being robbed ... [the officer] fired his weapon without warning or provocation.”).

. As I’ve described, there was no talk here. This was a knock and shoot.

. Jardines framed the issue, but it was not the first Supreme Court case to discuss the. legal basis for the knock and talk exception to the Fourth Amendment. See, e.g., Kentucky v. King, 563 U.S. 452, 469-70, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011).

. Florida, the state where Mr. Scott was killed, has passed statutes known as "Stand Your Ground” laws, which allow the use of deadly force in self-defense without the need to retreat. See Fla. Stat. § 776.012(2) (2014). Even in the minority of jurisdictions that re *1297 quire retreat, there is typically an exception for one's home. See, e.g., Conn. Gen. Stat. Ann. § 53a-19(b) (2010).

. Indeed, that is exactly what one witness said he thought was happening.

. Lara-Mondragon is an unpublished opinion. That being the case, I do not rely on it as binding precedent. It is not. Rather, the decision represents one of the few times our Court has addressed the permissibility of a knock and talk when the officers used any of the tactics seen here. It therefore gives some context to how similar facts have been addressed by this Court. Our Court often resolves qualified immunity questions in unpublished decisions.

.Our facts are different. Mr. Scott was not a suspect, was not known to be armed when the police surrounded his door, and did not know police were outside.

. The District Court received evidence in Flores-Castaneda. We have no credibility findings to defer to here, because this district court ruled on summary judgment, and we review summary judgment rulings de novo. Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

.In Walker, this Court rejected a claim that lateness alone rendered a knock and talk illegal "in light of all the circumstances surrounding the officers' actions.” 799 F.3d at 1364. Specifically, the lights were on inside the house; a light was on inside a car parked next to the house; and there was a person visibly slumped over the car's steering wheel. Id. at 1362, 1364. Walker is factually distinguishable, and at any rate concerned only one of the four aggressive police tactics used here. Walker may mean that the lateness of a knock and talk is not dispositive, but it does not mean lateness is not a relevant factor in judging reasonableness.

. These are not the actions of consensual visitors like "the Nation's Girl Scouts.” Jardines, 133 S.Ct. at 1415.

. Enforcing the legal limits of knock and talks "may mean that the police use a tactic like 'knock and talk' somewhat less frequently, but that may be the price of compliance with the Fourth Amendment.” United States v. Johnson, 170 F.3d 708, 718 (7th Cir. 1999).